Joe Davis v. The State.

No. 3765. Decided June 27, 1908.

1.— Murder—Evidence—Poisoning—Expert Witness.

Upon trial for murder there was no error in permitting an expert witness to express his opinion as to the cause of the death of the deceased based upon the testimony of the mother of the deceased as to the symptoms and the manner in which her daughter died; and it was not essential that the State's counsel in his hypothetical questions to an expert witness should state all the facts as they had been proved.

2.—Same—Evidence—Letters—Copies—Predicate.

Upon trial for murder where the theory of the State was that defendant killed his wife in order to marry another, there was no error in admitting

certain letters written by the defendant to said third party which were of a lascivious character showing his infatuation for said third party; and the State having laid proper predicate for the introduction of exact copies of said letters there was no error. Besides the defendant had admitted that he was the author of the original letters at a former trial.

### 3.—Same—Evidence—Declaration of Third Party.

Upon trial for murder there was no error in admitting in evidence a conversation between third parties in the presence of the defendant, in which he was accused of killing deceased to which he made no reply at the time; and this although one of the parties raised his fist when he addressed the defendant.

### 4.—Same—Filing Papers—Nunc pro tunc.

Where upon trial for murder the case had been transferred from another county to the county of the trial, there was no error in permitting the papers of the case to be filed nunc pro tunc.

### 5.—Same—Charge of Court—Express Malice.

Upon trial for murder where the evidence showed murder by means of administering to the deceased cyanide of potassium, there was no error in the court's charge on murder in the first degree and express malice to charge on antecedent menaces, lying in wait, former grudges and concerted schemes, etc., to kill the deceased.

### 6.—Same—Charge of Court—Applying Charge to Proof and Allegation.

Where upon trial for murder the indictment charged in one of its counts poisoning by cyanide of potassium, and there was evidence to sustain this allegation, there was no error in the court's charge applying the law of such poisoning to the facts in evidence and the allegation in the indictment.

### 7.—Same—Charge of Court—Reasonable Doubt—Unintentional Poisoning.

Where upon trial for murder there was no evidence suggesting that the alleged poison was unintentionally administered, and the court applied the reasonable doubt throughout his entire charge, there was no error in the court's charge to find defendant not guilty if death resulted from any natural cause unless the evidence showed beyond a reasonable doubt that the defendant administered to deceased the poison as alleged in the indictment.

### 8.—Same—Defendant as a Witness—Charge of Court.

Upon trial for murder there was no error in the court's charge that a defendant had the right to testify in his own behalf, and that the fact that defendant did not testify could not be considered as a circumstance against him.

### 9.—Same—Misconduct of Jury—Separation.

Where upon trial for murder two of the jurors who tried defendant had accidently separated from their fellows, for a short time, but had not communicated with any other person before they were returned by the officer into the jury box, there was no error.

### 10.—Same.

Where upon trial for murder defendant complained that immediately after the jury had made up their verdict one of them waved his hand to a crowd, and the juror denied this, and no evidence of any species of corruption was shown, there was no cause for setting aside the verdict.

### 11.—Same—Argument of Counsel—Correct Rule.

Where improper argument by State's counsel is of such a grave character as to render it obviously injurious and hurtful, and the matter is properly preserved by bill of exceptions, the fact that no special charge was asked instructing the jury to disregard the same, will not of itself deprive the appellant in a proper case of a reversal of a judgment of conviction.

**12.—Same—Case Stated.**

Where upon trial for murder the evidence of the State rested upon circumstantial evidence of poisoning, and one of defendant's witnesses questioned the symptoms attending the death of the deceased as showing poisoning as alleged in the indictment, it was reversible error for State's counsel in his closing argument to say that he had known this witness to testify in several other cases as an expert and that the jury in those cases paid no attention to a word he said; and this although no charge was requested to withdraw this argument from the jury.

Appeal from the District Court of Parker. Tried below before the Hon. J. W. Patterson.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*A. A. Clarke, E. N. Kirby, B. D. Shropshire, Stubblefield & Patterson,* for appellant.—On question of misconduct of jury: McCampbell v. State, 37 Texas Crim. Rep., 607; Early v. State, 51 Texas Crim. Rep., 382; 19 Texas Ct. Rep., 272; Griffey v. State, 56 S. W. Rep., 335; Jones v. State, 11 Texas Ct. Rep., 435; Robinson v. State, 30 Texas Crim. App., 459; English v. State, 28 Texas Crim. App., 500; Neal v. State, 51 Texas Crim. Rep., 513; 18 Texas Ct. Rep., 733. On question of court's charge on express malice: Lynch v. State, 24 Texas Crim. App., 350; Reeves v. State, 34 Texas Crim. Rep., 482; McSpatton v. State, 30 Texas Crim. App., 616; Arthur v. State, 46 Texas Crim. Rep., 477; 10 Texas Ct. Rep., 577. On question of unintentional killing: Bond v. State, 23 Texas Crim. App., 180; Smith v. State, 24 Texas Crim. App., 290; Nalley v. State, 30 Texas Crim. App., 456. On question of admitting expert testimony: Morrison v. State, 40 Texas Crim. Rep., 473; Williams v. State, 37 Texas Crim. Rep., 348; Burt v. State, 38 Texas Crim. Rep., 397; Leache v. State, 22 Texas Crim. App., 279. On question of admitting letters in evidence: Williams v. State, 38 Texas Crim. Rep., 128; Haun v. State, 13 Texas Crim. App., 383; Harris v. State, 67 S. W. Rep., 327. On question of argument of counsel: Tillerly v. State, 24 Texas Crim. Rep., 251; Miles v. State, 65 S. W. Rep., 912. On question of admitting declaration of third parties: 12 Cyc., p. 423.

*F. J. McCord,* Assistant Attorney-General, for the State.—On question of expert testimony: Watson v. State, 32 Texas Crim. Rep., 80; Leache v. State, 22 Texas Crim. App., 279; Lovelady v. State, 14 Texas Crim. App., 545; Webb v. State, 9 Texas Crim. App., 490; 5 Enc. Ev., 619; Hunt v. Lowell Gas Light Company, 8 Allen, Mass., 169; Jones v. Chicago & St. Paul Railroad Company, 46 N. W. Rep., 444; State v. Hayden, 51 Vermont, 296;

Gillam v. Stratford, 50 Vermont, 723. On question of misconduct of jury: Davis v. State, 3 Texas Crim. App., 91; Cox v. State, 7 Texas Crim. App., 1; Ogle v. State, 16 Texas Crim. App., 361; Kelly v. State, 28 Texas Crim. App., 120.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Shackelford County, on the 19th day of October, 1904, charging him with the murder of his wife, Olga Davis, by poisoning. There are eight counts in the indictment, and the murder of Mrs. Davis was charged to have been committed by administering quinine and cyanide of potassium; quinine and strychnine; cyanide of potassium; strychnine and quinine and other poisons. The case, after several changes of venue, came to be tried in Parker County, where on the 9th day of November, 1907, appellant was convicted of murder in the first degree and his punishment assessed at death. The evidence in the case is very voluminous and it will be impossible to do more than to give a brief summary of enough of the facts to illustrate and render intelligible our opinion. The deceased was, at the time of her death, staying with her parents near the town of Moran in Shackelford County. She was many months advanced in pregnancy and the time for the birth of a child had almost arrived. A very short time prior to her death she and her husband made a journey in a buggy to the town of Clyde, in Callahan County, a distance of twenty-five or thirty miles, to visit an uncle of appellant and returned home the next day. On their return appellant and his wife went to the tank in an open pasture and took a bath, or deceased, at least, took a bath in a tub. The evidence shows that they returned from their journey to Clyde on Wednesday and that deceased took her bath in the open air on the Thursday night following. About midnight on that night Mrs. Davis was discovered to have been taken very suddenly sick and died in a short time, living probably from half an hour to an hour after her mother discovered her sickness. Her mother, Mrs. Bills, gives substantially this account of her daughter's sickness: She says that Mrs. Davis had been in the habit of usually coming to her room before retiring at night, but on the night of her death for some reason she failed to do so. That quite well on in the night she got up from her room to go into the room of her daughter, Mrs. Davis, and about the time she was opening her door, her attention was attracted by a noise in her daughter's room; that she went to the door and knocked and that appellant invited her in and that at the time appellant had his hands upon his wife's stomach holding her as she thought; that she asked her daughter if she was sick, meaning to inquire whether she was about to be confined; that her daughter was gasping for breath; that she kneeled down over her daughter and at the time smelled a very strong scent which almost strangled her and that her daughter said, "Oh,

mamma, my head, and such a strange, tingling feeling came over me," and then said, "Mamma, this is death;" that she, Mrs. Bills, then got up and lit a lamp and when she looked back her daughter, Olga, was very purple and there was a stare in her eyes. J. W. Bills, father of the deceased, was present at the time of her death but did not testify. Her two half-brothers, Newt and Ralph Hale, were present when Mrs. Davis was taken sick, but were sent for Dr. Dingle. The testimony of neither of these half-brothers particularly supports the testimony of their mother, Mrs. Bills. Upon the testimony of Mrs. Bills, as a predicate, the State introduced Prof. Seth Morris, of the State University, who, qualified as an expert and gave, at some length, a statement as to the symptoms and effect of cyanide of potassium poison, and basing his judgment upon the testimony of Mrs. Bills, asserted it as his opinion that Mrs. Davis probably came to her death from cyanide of potassium poisoning. Dr. McNalley, another witness for the State, testified substantially to the same effect. The appellant introduced on this matter, Dr. W. Y. McKinzey, of Weatherford, who testified in substance that he had been a practicing physician for twenty-four years. In reply to a question by the State in which the facts testified to by Mrs. Bills were stated quite as strongly as her evidence would justify, Dr. McKinzey stated that the death of Olga Davis could have been caused from an embolism, a puerperal convulsion, that comes in childlabor, or from poison. Dr. Dingle, who was called to see Mrs. Davis, testified to attending her and to giving her artificial respiration by working her arms, etc., and also testified that he did not detect any unusual odor about Mrs. Davis, nor did he testify to any other symptoms of poison which appear in the testimony of Mrs. Bills. Mrs. John Cane, a witness for defendant, testified that she was called to the home of Mrs. Bills on the occasion of the death of Mrs. Davis and assisted in the preparation of the body for burial and that she did not detect any unusual odor when she went into the room where the remains were, but that she did detect an odor as of decomposition at the time her lower limbs were being handled. It was shown in the testimony of Dr. McKinzey that the symptoms of an embolism were in many respects identical with the symptoms of cyanide of potassium as testified to by Dr. Morris. In keeping with the request of Mrs. Davis, she was buried at Beaumont and something like a month after her interment, Dr. Morris made an investigation and found no trace of poison, though the evidence developed that this poison was such as that it was not likely or necessarily to be discovered by the most careful examination after this lapse of time. The State offered in evidence copies of six letters shown to have been written by defendant to one Clara Cheshier, or Clara Jones. The purpose of this testimony was to show the infatuation of appellant for this woman, the motive for the death of his wife

and also claiming that the letters themselves contained evidence and admissions that he intended to kill his wife. These letters evidence a mad infatuation on the part of appellant for this woman and contain some expressions consistent with the claim of the State of a purpose on the part of appellant to kill his wife. Appellant was shown to have purchased, or at least paid for some considerable quantity of strychnine and cyanide of potassium, though it is rendered possible that this may have been intended for the purpose of killing wolves. There was no evidence of any actual quarrel between appellant and his wife or any threats to do her violence, unless such threats may be inferred from statements contained in his letters. Other facts necessary to an understanding of the case will appear on in the opinion.

It is shown by bill of exceptions No. 1 that the State placed Prof. Seth A. Morris upon the stand, who testified that he was Professor of Chemistry in the University of Texas, and that he had had experience with cyanide of potassium with animals only. That he was familiar with the symptoms of cyanide of potassium from his experience with it on animals and from studying, lecturing and teaching, and among other things said: "I have heard the testimony of Mrs. J. A. Bills and other witnesses in regard to the death of Mrs. Olga Davis. I have testified as to the symptoms of cyanide of potassium." After said witness, Professor Morris, had testified as above set out counsel for the State propounded the following questions to the said witness: "I will ask you whether or not, in your judgment, in your opinion as an expert based on the testimony of Mrs. J. A. Bills, as to the manner in which her daughter died, the manner of her death and the symptoms attending her death, whether or not, in your opinion, she died a natural or an unnatural death, assuming that her testimony was as to symptoms true, state whether or not she died from natural or unnatural cause. To which question the witness answered: "I should think it somewhat unnatural." Said witness further testified: "I know of no other unnatural cause of death in which the symptoms harmonize as well as those described by Mrs. Bills than cyanide of potassium. I am of the opinion that was probably the cause of her death, assuming that these facts as to symptoms are correctly stated and are true; I would expect that it was cyanide poisoning. Taking the symptoms that I find in Mrs. Bills' testimony and assuming that they are true, in my judgment the cause of Mrs. Davis' death was cyanide of potassium poisoning." To this testimony appellant objected because the opinion of said witness was predicated upon the testimony of the witness Mrs. J. A. Bills alone, and it was affirmatively shown that Dr. W. P. Dingle was present at the time of the death of Olga Davis, or immediately thereafter and that said Dr. Dingle

testified to certain symptoms and conditions of the said Olga Davis, and of her appearance and the expression of her eyes, and the color of her skin, at the instance and request of the State; and other witnesses testified to being present at or about the time of the death of the said Mrs. Olga Davis, and before the said witness could be required to give his testimony to the cause of the death of the said Olga Davis, it was required of the State to show that said witness had heard all of the testimony in reference to the manner of the death of the said Olga Davis, and if the said witness could be permitted to state his opinion as to the cause of the death of the said Olga Davis, he could only give his opinion after hearing all of the testimony in reference to the cause of her death. Appellant further objects on the ground that it was not permissible for the State to introduce the opinion of the said witness as to the cause of the death of the said Olga Davis, because it was not made to appear to the jury, upon what the said witness was predicating his opinion, and because it was the province of the jury to consider all of the evidence in the case, and to determine the cause of the death of the said Mrs. Olga Davis. Appellant's objections are not well taken. It would be well here to state that appellant was convicted of administering cyanide of potassium poisoning to his wife from which she died. The doctor, as disclosed by the above bill of exceptions, was simply attempting to give his medical opinion from symptoms stated by deceased's mother, and conceding said statements to be true, was asked as to what character of poisoning would produce said symptoms, and stated that in his opinion cyanide of potassium would produce said symptoms. The authorities of this State clearly lay down that this was proper practice. Each side has a right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence and if meagerly presented on one side it may be fully presented on the other, being within the control of the court whose duty it is to see that the examination is fairly and reasonably conducted. In putting hypothetical questions to his witness, counsel may assume the fact in accordance with his theory of things, and it is not essential that he state all the facts to the witness as they have been proved. See Leach v. State, 22 Texas Crim. App., 279; Lovelady v. State, 14 Texas Crim. App., 545. Furthermore, it is well settled that an expert may be asked for his opinion, based upon the facts testified to by several witnesses, which testimony he has heard without a hypothetical statement of such facts, if there is no material conflict in the testimony, and the question is so framed that the jury understand the exact facts upon which he is required to base his expert opinion. Of course, it is never permissible for an expert to draw his own inferences from conflicting testimony, or to give his opinion as to the truth or falsity of the facts, since this would invade the province of the jury. This

question was passed upon in the case of Morrison v. State, 40 Texas Crim. Rep., 494, and Burt v. State, 38 Texas Crim. Rep., 434.

Bill No. 2 complains of the introduction of the testimony of Dr. McNalley to the same effect as disclosed by bill No. 1.

Bill No. 3 complains that the State offered in evidence alleged copies of six original letters purported to have been written by defendant to Clara Jones, which said alleged copies of the six original letters are embodied in the bill. Appellant objects to the introduction of the copies for the following reasons: 1st. The original letters, if any existed, are the best evidence of their contents, and the alleged copies of the original letters were secondary evidence, and therefore the alleged copies would not be admissible. 2d. The proper predicate for the introduction of secondary evidence, of the contents of the said alleged original letters was not shown and the original letters, if any existed, were not shown to have been lost, and if any did exist, it was not shown that proper search was made for them. Then the bill embodies the testimony of the District Attorney, W. L. Cunningham, which is too long to be quoted in extenso in this opinion but the substance of it, as a predicate for the introduction of the letters is as follows: That he was district attorney at the time of this prosecution and the letters in question were turned over to him. Having the letters in his pocket one day, he took them out and showed them to a couple of ladies at a private residence where he was stopping in Eastland, county seat of Eastland County, and that after the ladies examined same they were returned to him. That he went from said residence to the town of Abilene went to his home but did not stop or sit down there, came back that night on a passenger train and lay down and went to sleep, but did not discover the loss of the letters until after his return to Eastland County and there he informed the sheriff that he had lost the letters; that he and his wife made diligent search at the home where he was stopping, inquired of parties for the letters and a conductor on the passenger train brought to him one or more letters saying they were all he found, which letters were turned over to the witness, Cunningham, but neither of said letters were the original letters that had been lost by him pertaining to this case. The evidence in this record further shows that appellant on a previous trial admitted the authorship of the original letters and a witness was introduced to show further, that the copies were literal and exact copies of the original letters made after the utmost pains and care to spell each word exactly as it was in the original letters and even the punctuation was followed literally. This is the testimony as a predicate for the introduction of the copies of the original letters complained of. We hold that the predicate was properly laid. If the witness had known where he lost the documents they would not have been lost. There is a circumstance in the fact that

the conductor brought him one or more letters that he had found on the train, to indicate that they dropped out of his pocket while he was asleep in the train, but if they did, there is nothing to show where he would likely find the missing letters, by sheer force of the fact that the conductor had found two letters that belonged to the district attorney, but did not find the letters in question, nor where the witness could look for the letters. Furthermore, even conceding a predicate was not laid as accurately as it might have been, appellant, having admitted on a former trial that he wrote the letters, the State having proved these copies to be literal and exact copies of the original letters, no possible injury could have accrued to appellant by the introduction thereof. The letters introduced were entirely germane to this case, since they show that appellant, while married to the deceased, was engaged in a reprehensible and lascivious correspondence with the woman, Clara Jones. The State's theory of the case was that he killed his wife in order to marry the said Clara Jones. Said testimony was very pertinent in the trial of this case.

Bill No. 4 complains that the State proved by W. J. Cunningham and J. A. King the following: On the former trial of this case appellant had gone upon the witness stand in his own behalf, and stated that he, defendant, had written six letters to Clara Jones; that the said letters were presented to said Joe Davis while he was a witness upon the stand and he had read same and stated then and there that he wrote each and all of said six letters; and then follows a true and correct copy of each of said letters. With the foregoing predicate and the one here laid, the letters were entirely admissible.

Bill No. 6 shows that the State introduced Walter Bills, who testified: "I am the brother of the deceased, Olga Davis. At the time Olga Davis, the deceased, was carried to Beaumont for interment, I accompanied her remains, as did also the defendant, Joe Davis; after her interment the defendant and I went to Sour Lake, where his mother and stepfather resided. We went to the house of the defendant's mother and stepfather. The defendant first left said house and the next time I saw Davis, it was about an hour and a half, I saw him in the street. I was with his stepfather, Mr. Hale. We were standing in the street by the Cummings rooming house, is what they told me. Mr. Hale, his stepfather, and I were standing by the stair steps leading up to the Cummings house in conversation and the defendant came down, and I called him to me. I told him that his folks were accusing him of murdering my sister and I wanted him to straighten it up and he said they would tell me plenty of damn lies. His stepfather, Mr. Hale, was standing there, and heard what he said and Mr. Hale walked around me and said: 'You can not accuse them of telling damn lies, that it was the truth and you know it,' and the defendant made

no reply to this. He said: 'Let's go down to the house and talk it over and straighten it up.' At the time that Hale made that remark to the defendant he threw up his fist." To the introduction of all of the said evidence as to what Hale said and did the defendant at the time objected because what defendant said was not a confession of guilt, and because said statement and remarks made by said Hale did not accuse defendant of murdering his wife and the failure of the defendant to deny the same did not amount to an admission or confession on his part that he was guilty of the crime for which he was being tried, and because said statement and remarks made by said Hale in connection with the other evidence does not amount to a confession. This testimony was entirely admissible. There is no evidence that he was under any physical or moral restraint at the time the conversation took place. The mere fact that Mr. Hale raised his fist would only go to the weight of his testimony, to say the least of it, and not to its admissibility. Appellant could argue the question before the jury, of course, that he was afraid to deny the statement as he had been accused, on account of his stepfather, but as suggested, this would merely go to its weight. It was a statement highly criminative, if true, and was germane to the proper trial of this case.

The county attorney filed a motion to have the papers filed nunc pro tunc in this case,—that is to say, the case was transferred from Eastland County to Parker County; the case was properly docketed, but the clerk failed to place the number on the indictment and other papers in the cause, and also failed to place his file mark on any of said papers. This court has permitted this to be done. See Rico v. State, decided at the present term of this court.

The third ground of the motion for new trial complains of the following charge: "Express malice is when one with a sedate and deliberate mind and formed design, unlawfully kills another; which formed design is evidenced by external circumstances discovering that inward intention, as lying in wait, antecedent menaces, former grudges and concerted schemes to do him some bodily harm; or any other circumstances showing such sedate and deliberate mind and formed design to unlawfully kill, or to inflict serious bodily harm which might probably end in the death of the person upon whom the injury was inflicted." The objection to this charge is that there is no fact introduced which authorizes such a charge on the part of the court, and because there was no evidence of lying in wait or antecedent menaces, or former grudges, or concocted schemes to do Olga Davis bodily harm on the part of the defendant as would warrant the submission of such an issue to the jury. The evidence in this case clearly warrants the charge since the evidence showed that there was a concerted scheme, antecedent menaces, or at least, former grudges against the wife and concerted schemes to take her life by adminis-

tering to her cyanide of potassium, one of the most deadly poisons. Appellant further complains of the following charge: "If you find and believe from the evidence beyond a reasonable doubt, Joe Davis, did in the County of Shackelford, and State of Texas, on or about the 18th day of August, 1904, and before the 19th day of October, 1904, the date of the filing of the indictment herein, with malice aforethought, unlawfully administer, or cause to be administered to Olga Davis a substance called cyanide of potassium, with the intent then and there on the part of the defendant to kill the said Olga Davis; and if you believe the said cyanide of potassium was a poisonous substance and that the said Joe Davis, the defendant, knew and intended that the said Olga Davis would take and swallow the said poison so administered to her, if any poison was administered to her, and that he intended that said Olga Davis should be poisoned and killed thereby, and if you believe that said Olga Davis did not then and there know that the same was poison, and if you believe that by reason of the taking and swallowing of said substance the said Olga Davis was then and there on or about the 18th day of August, 1904, poisoned and killed and that her death was then and there caused by said poison, you will find the defendant guilty of murder in the first degree, and so say in your verdict and assess his punishment at death or at confinement in the penitentiary for life as you may determine and state in your verdict." Appellant's objection to this charge is that there is no count in the indictment which warrants said charge and that same was not the law, applicable under the charge in the indictment and under the evidence in this case. This charge was directly applicable to a count in the indictment and was clearly authorized by the evidence in this case. Appellant objected to the following charge: "If Olga Davis died a natural death, or if she died from the effects of pregnancy, or from giving birth to a child, or in an effort to give birth to a child, or from any cause other than cyanide poison the defendant can not be convicted, and if her death was so caused, you should find him not guilty; and you will find the defendant not guilty, unless you find and believe from the evidence herein beyond a reasonable doubt that Olga Davis is dead and that the defendant administered, or caused to be administered to her, cyanide of potassium and that the death of the said Olga Davis was caused by said cyanide of potassium." Appellant complains that said charge as given is not an affirmative and substantive statement of the matters and defense set up by the defendant, as required by law, but is coupled with a condition; the condition contained in said charge is in itself erroneous in this: Same is not based upon the guilty knowledge of the defendant, but is so framed as to exclude a verdict of not guilty, notwithstanding the defendant may have unintentionally administered the poison. There is no evidence in this case suggesting that the poison

was unintentionally administered, even if subject to the line of criticism complained of, which we do not concede. Appellant further complains that said charge is erroneous in that it does not state that if the jury had a reasonable doubt as to whether the deceased died from the effects of pregnancy, or from giving birth to a child or from any other cause than cyanide of potassium, they should acquit. The court applies reasonable doubt all through his charge and this criticism is not correct.

The sixth ground complains that the court erred in giving the following to the jury: "A defendant on trial has the right to testify in his own behalf." This is only the first clause of the charge. The charge is unobjectionable since it tells the jury they must not consider such fact as a circumstance against appellant and in other respects is similar to charges frequently approved by this court.

Appellant further complains of the misconduct of the jury. The statement of facts, which is very voluminous on this question, shows in substance, that the trial occurred on the second floor in the District Court room of Parker County; that the third floor had a water closet within a few feet of the room where the jury were accustomed to sleep, during the trial of this case. The jury, desiring to obey a call of nature, were taken out of the jury room, up a flight of steps, the deputy sheriff accompanying them, and after two of the jurors had gone into the closet and come out, they stepped into the bed room, which was a few feet from the closet. When the other ten jurors got through using the water closet, the deputy sheriff who alone was with the jury, went back to the courtroom thinking all were in the party, but the moment he arrived there he was informed that two of the jurors were still back upstairs, he rushed back and found the two jurors mentioned sitting by a window, and hurriedly carried them and placed them in the jury box. No one, according to the evidence, was on the floor except the janitor. He discovered that there were but ten jurors in the party that passed him on the stairway and passed to the room where the jurors sat and rushed out without saying a word. The jurors who were in the room swear positively they did not communicate or say a word to anybody and had no opportunity to do so. That they could not see from the bedroom down in the courthouse yard without leaning out of the window, which neither of them did, but could see parties about two hundred feet away passing around the square of the town. Appellant further complains that immediately after the jury had made up their verdict that one of them waved his hand to a crowd on one side of the square. This the juror denies, or at any rate it does not show any criminality nor evidence any species of corruption. In the case of Barnett v. State, 50 Texas Crim. Rep., 538; 17 Ct. Rep., 971, the question

there complained of was this: The jury was placed in a room of a hotel to sleep. There was evidence showing that without going together, each was permitted, during the night unattended, to go to a water closet upon the same floor of the hotel. Various parties had access to this same closet. However, there was nothing in the record to show that either of the jurors conversed with anyone about the facts of the case or anything else. Here, however, the evidence excludes the idea that anyone was upon the floor except the janitor, as stated, and the evidence shows conclusively that no one could or had any chance to communicate with the jurors. We do not think there is any such separation as is prohibited by the statute.

We think, however, the case must be reversed on account of the improper argument on the part of the county attorney who made the closing argument in the case. Among other things in his testimony, the witness, Dr. McKinzey, stated that in his opinion had the said Olga Davis swallowed an amount of cyanide of potassium sufficiently large enough to produce the fume and odor described by the State's witness, Mrs. Bills, as set forth in the statement of facts, that in such case deceased could not have lived and been conscious long enough to make the statements to Mrs. Bills which are set out in the statement of facts herein. Said witness further testified that in his opinion, deceased may and probably did die of an embolism or some puerperal convulsion and to other facts in favor of defendant's theory of the case, which appear at some length in the statement of facts. Mr. James C. Wilson, the county attorney of Parker County, in making the closing speech to the jury, among other things, stated: "Why, gentlemen of the jury, I have known this witness, Dr. McKinzey, to testify in several other cases as an expert and the jury in those cases paid no attention to a word he said." Appellant at the time excepted to the language of the county attorney. The court allowed the bill with the following qualification: "When he made the remark relative to Dr. Mc-Kinzey, complained of, he made the following remarks in connection with those complained of: 'Gentlemen, the defendant's attorneys are bearing down on the testimony of Dr. McKinzey, their expert, and talk to you about his great knowledge and long experience in obstetrics. Now, I love Dr. McKinzey, he is a fine man. He is my wife's doctor. I have had him in one case of this kind and expect I will have him in several more cases. He is a good granny. But he is an old bachelor and has lived alone and had nothing to do with any one socially until when I see him lying around in the sun over at Cotton's Corner, he reminds me of an old yellow tom cat, that has passed through the boot experience and if you pass there and rub his hair the wrong way he will scratch you; I have often seen him used as a witness and he gets mad for the

side that puts him on and against the side that cross-questions him. If you ask him a question that shows you question his information, he gets mad just as he did in this case. The defense questioned him and passed him to us; Mr. Cunningham questioned him and he got mad; you men saw what happened when Mr. Clark on redirect asked him if Olga Davis had taken a dose of cyanide of potassium large enough to have caused the fumes from her breath to have had the effects on Mrs. Bills such as she describes, would Olga Davis have lived long enough to have said what Mrs. Bills claimed. To that answer came, 'No,' and mad and with a snarl. This is one famous 'No' they have argued so much about. Well, that does a witness no good. He answered that 'No' with no conditions or qualifications and afterwards had to back upon it and say it did depend upon the condition of the stomach, etc. But this is his fashion and manner always and for this reason I have seen two juries pay no attention to what he said.' At this point of the argument of Mr. Wilson the attorneys for the defendant objected and I stopped Mr. Wilson in the argument and told him to confine himself to the record. No charge was asked by defendant that the jury disregard this statement." We think the statement of which complaint is made was a serious invasion of the rights of the appellant, a statement of a material fact dehors the record and such an attack, without warrant of law or basis in the evidence, upon the credibility of the witness McKinzey as of necessity to do appellant serious injury. Prosecuting officers in their zeal for a conviction of parties on trial should not lose sight of the fact that they are just as much sworn to try the case according to law as they are to zealously represent the State's interest. In the case of Machem v. State, 53 Texas Crim. Rep., 115; 109 S. W., 126, in discussing a similar matter, the writer speaking for the court, said: "It is unnecessary for us to determine in this case how far this language was justified, or whether it furnishes grounds upon which the case would be reversed; but, in view of the fact that in very many cases that come before this court complaint is made, and frequently not without good reason, of the incendiary and inflammatory speeches of State's counsel, with statements of extraneous facts, references to the failure of the defendant to testify, and other kindred matters, we feel constrained to say that more discretion and self-restraint should be used in discussions and arguments before the jury. We would not in the slightest abate the zeal of State's counsel in their efforts to enforce the law. Such zeal and the best efforts of counsel so to do are worthy of and should receive the highest commendation. Nor are we unmindful of the fact that of necessity some latitude must be allowed in argument, but it would be well to remember that it was designed that all discussions before the jury should be in respect to the facts of the case. If a fair discussion of the

facts of a case does not obtain a verdict of guilty, it would usually be because a verdict of guilty ought not to be rendered; and, if a verdict is extorted or obtained by improper discussion, it is the duty of this court, and one that must be enforced with a strong hand, to set aside a conviction so obtained." It will be noted that in the explanation of the learned trial judge to the bill of exceptions touching this matter, he states that no special charge was requested by counsel for appellant in respect to the improper argument. There are numerous cases, too numerous to be referred to by this court, in which we have said that in order to entitle the defendant to a reversal, because of improper argument by the prosecuting attorney, he should promptly except to the same and request a special charge withdrawing same from the consideration of the jury in order to have the question on appeal. Anschieks v. State, 6 Texas Crim. App., 524; Jackson v. State, 18 Texas Crim. App., 586-598; Young v. State, 19 Texas Crim. App., 618-634; Watson v. State, 28 Texas Crim. App., 34-41; Kennedy v. State, 19 Texas Crim. App., 618; Rahm v. State, 30 Texas Crim. App., 310-313; Wolfforth v. State, 31 Texas Crim. Rep., 583-585; Wilson v. State, 32 Texas Crim. Rep., 22-24; Jones v. State, 33 Texas Crim. Rep., 7; Boscow v. State, 33 Texas Crim. Rep., 390-392; Wright v. State, 37 Texas Crim. Rep., 146; Gilmore v. State, 37 Texas Crim. Rep., 178; Frankling v. State, 38 Texas Crim. Rep., 346; Hines v. State, 32 S. W. Rep., 701; Exon v. State, 33 S. W. Rep., 336; Epps v. State, 33 S. W. Rep., 975; Othod v. State, 33 S. W. Rep., 1084; Masterson v. State, 34 S. W. Rep., 753. And it has been held in other cases that where the remarks of the prosecuting attorney in argument were excepted to, but no charge in regard to them was asked, no error is presented. This language has been so frequently used by this court that it is not singular that the learned trial Judge seemed to attach much importance to the fact that no charge was asked by counsel for appellant instructing the jury to disregard the improper argument objected to. We think, however, the true rule in respect to this matter may be thus stated, that unless the remarks of counsel for the State are obviously of a character to impair the rights of the defendant or prejudice his case before the jury, such remarks, though improper, will not be considered for reversal unless a charge was asked and refused and exception reserved. Lancaster v. State, 36 Texas Crim. Rep., 16, and that it follows as a necessary corollary from this doctrine that where the improper argument is of such a grave character as to render it obviously injurious and hurtful, and the matter is properly preserved by bill of exception, that the fact that no special charge was asked instructing the jury to disregard same, will not of itself deprive the appellant in a proper case, of reversal of a judgment of conviction. It has been held in all the cases which we have

examined, that a reference to a former conviction of an accused is of necessity ground for reversal, whether a special charge in respect to such matter is asked or not. Fuller v. State, 30 Texas Crim. App., 565; Moore v. State, 21 Texas Crim. App., 666. It may be said, however, not without some force, that this is true because the provision that no reference or discussion of the former trial is inhibited by statute, but the inhibition against statements of extraneous facts or other improper argument, while probably not so expressly prohibited, is inhibited by every reasonable implication of the law. We think we may illustrate our views in respect to this matter by reference to the decision of Judge Henderson in the case of Locklin v. State, 8 Texas Ct. Rep., 204. In that case Judge Henderson states that the general rule is that in order for improper argument to constitute ground for reversal opposing counsel must have objected at the time and requested the court to charge the jury to disregard such argument; that is, a charge in writing must be requested and refused and exception taken to the action of the court in order to constitute ground for reversal. In that connection, however, he uses this language: "As an exception to this rule, it is held that if the language used in the argument is of such inflammatory character as, under the circumstances, is calculated to injuriously affect the prisoner, such that even a written charge would not ordinarily cure, then the court will reverse, although no written instruction was asked and refused." The same doctrine is recognized in the case of Powell v. State, 70 S. W. Rep., 218, also in the case of Fredericson v. State, 70 S. W. Rep., 754. The language used in the Fredericson case was as follows: "Gentlemen of the jury: There are many communities and counties where this negro would have already been mobbed, but the good people of this community have chosen to let the law take its course, and they expect you to give the defendant the highest penalty." In discussing this language in that case, Judge Henderson says: "We can not understand the language here used to convey any other idea than to suggest to the jury that the good people of the county had refrained from mobbing appellant with the expectation on their part that appellant would be given the highest penalty. This language was a menace and threat to the jury that should not have been permitted." In the case of Smith v. State, 68 S. W. Rep., 995, the argument objected to was as follows: "This is the most horrible crime, so far as my long experience at the bar has brought to my attention. I am surprised that this case was ever brought here; and that it ought not to have been brought here; that, while I do not believe in mob law as a rule, yet in a case like this the law ceased to be a virtue." On objection the court reprimanded counsel and further, at the request of the appellant, instructed the jury not to regard said remarks. In commenting

on this matter, Judge Henderson in the opinion, says: "It has been held, however, that ordinarily a charge of the court instructing the jury to disregard improper remarks made will cure the error. But of course there may be cases, on account of the violence of the remarks and the inflammatory character of appeal used where this rule would not apply. It would seem that this would be such a character of case. · We can imagine no greater outrage in a court of justice than an appeal to mob law or an invocation to the jury that they should hang appellant because a mob had failed to do so. The instruction of the court could hardly eradicate from the minds of the jury the effect of such an appeal to them." In the case of Robbins v. State, 83 S. W. Rep., 690, the judgment was reversed mainly because of improper argument to the jury, although the court instructed the jury to disregard part of it. In the course of his opinion, Judge Henderson used this language: "It occurs to us that such conduct, even though the court instructed the jury to disregard such argument, would be cause for reversal. So much of this character of argument was calculated to thoroughly poison the minds of the jurors against appellant as a man of the most base and vicious character, and not only tend to his conviction, but also to increase his punishment. Under the circumstances it was impossible for the court to withdraw the dagger and heal the wound inflicted at the same time." In the case of Taylor v. State, 50 Texas Crim. Rep., 560; 100 S. W. Rep., 393, Judge Brooks, of this court, in discussing an argument to the jury, claimed to have been improper, uses this language: "The language of the county attorney in his argument to the jury, as disclosed by these two bills of exception, was highly inflammatory and prejudicial to the rights of appellant, and the court should not only have reprimanded the counsel, but should have charged the jury to totally disregard such argument. The penalty in this case, as above stated, was death. Here we have the county attorney demanding of the jury that they should not consider whether the facts authorized murder in the second degree or not. He states in his argument that it would do no good to confine appellant in the penitentiary, as he would kill the guards and escape. This is not legitimate argument; in fact, no argument at all. As to what appellant should do in the penitentiary or would do, even conceding that he would kill the guard, which there is no evidence in this record to indicate, would not be a legitimate basis for forming a conclusion as to whether or not he was guilty of murder in the first or second degree. The defendant is entitled to a fair and impartial trial. The counsel should confine his arguments to proper and legitimate deductions from the evidence adduced upon the trial of the case. We apprehend that the facts in this case give as little excuse for resorting to extraneous matters to prejudice the jury as most cases that

are tried in the courts of this country, but here we have the county attorney resorting to race prejudice, in the first instance, to extort from the jury a death penalty, and, in the second instance, we have him using the fact that the defendant had been previously confined in the penitentiary as a reason why he should not be again confined. The fact of appellant having previously been in the penitentiary was admitted by the court for the sole purpose of testing the credibility of the appellant as witness in his own behalf. It was legitimately admissible for this purpose, and could not legitimately be used for any other purpose. The court so informed the jury, in his charge, that the county attorney used the fact of previous incarceration in the penitentiary as a basis for concluding that he should be hung now, since his previous incarceration had not reformed him. It is true no special charges were asked, but nevertheless, in the light of this record, this argument is so highly prejudicial as to exclude every other reasonable hypothesis than that it was prejudicial to the rights of appellant. It follows, therefore, that the court erred in not granting a new trial to appellant on account of the argument and statements of the county attorney." See also Tillery v. State, 24 Texas Crim. App., 273, and Miles v. State, 61 S. W. Rep., 912. The nature of the charge in this case, the heinous character of the offense, the fact that the victim was his wife and that the motive was love and infatuation for another woman, all made it peculiarly important that no improper evidence should have been admitted or improper argument allowed during the progress of the trial. While the testimony of Mrs. Bills relates symptoms from which, in the light of the testimony of the State's expert, death by cyanide of potassium is rendered very probable, it is strangely significant that neither the attending physician or anyone else found any indication or trace of such poisoning. Whatever we may be inclined to think of the testimony of Dr. McKinzey, it strongly dissents from the State's theory and in effect supports appellant's contention that the death of Mrs. Davis resulted from some sudden convulsion having its origin from natural causes. No one would question that it would not have been permissible for the State to have proved on the trial, as evidence in the case, that two juries in other cases had paid no attention to or had disbelieved the evidence of Dr. McKinzey. He stood before the jury as any other witness to be judged of and his testimony to be weighed with reference to his intelligence and all the other facts and circumstances from which, and with reference to which, the jury could form an intelligent judgment and conclusion. Therefore, when State's counsel in the closing hours of the trial and in the closing argument to the jury, stated to them as a fact that within his knowledge two juries or juries in several other cases had paid no attention to a word he said, he was stating a fact of such tre-

mendous importance in respect to such witness and of such harmful consequence to this appellant, as, in our judgment, would leave us absolutely without excuse if we did not reverse the case. Nor, as we believe, is the matter improved or changed by the court's explanation of the counsel's statements. That Dr. McKinzey was the friend and family physician of counsel would, before the jury, rob the statement of any claim or pretense that it was untruly made, or as the result of ill-will or malice on his part, but rather gives it as a statement of a friend who could not and would not, as the jury would suppose, make such a statement unless it were true. It is significant again, that when the court instructed counsel to confine himself to the record that there was no withdrawal of the language, no admission of the inaccuracy of the statement but only and merely a suggestion on the part of the court to confine himself to the record. It was, as we believe, such a statement as ought not to have been made and as this counsel would not have made except carried away in his zeal to secure what he doubtless believed to be a just and deserved conviction. We would not be understood in anything we have said as intending to cast any reflection on counsel who has not infrequently appeared before this tribunal and whom we know to be a lawyer of not only high character but commanding ability. This fact and the fact that he was the State's counsel, the County Attorney of Parker County, made the statement the more serious and inevitably injurious. The conviction is one carrying with it the death penalty. We are unwilling that any citizen of Texas should be fated to the ignominy of the scaffold and be doomed to yield up his life on the gallows, where it can, as we think, be rendered probable, if not certain, that the gravest punishment which the law allows, if not in fact his conviction, was procured or brought about by the statement of an important fact not in the evidence.

For the error pointed out, let the judgment of the court below be, and the same is, hereby reversed and the cause remanded.

*Reversed and remanded.*

Brooks, Judge, dissents.

[Motion for rehearing overruled December 9, 1908.—Reporter.]