## John Dies v. The State.

No. 4401.   Decided March 3, 1909.

Re-hearing Denied April 14, 1909.

**1.—Rape—Indictment—Venue—Constitutional Law.**

Under the Act of June 18, 1897, Special Session Twenty-fifth Legislature, p. 16, prosecutions for rape may be commenced and carried on in the county in which the offense was committed or in any county of the judicial district in which the offense was committed, etc., and an indictment for rape found in a county of the judicial district in which the offense was committed is valid; and said act does not contravene either the State or the Federal Constitution. Following Mischer v. State, 41 Texas Crim. Rep., 212.

**2.—Same—Jury and Jury Law—Challenge for Cause.**

Where upon trial for rape, a juror on his voir dire stated that he had a general prejudice against the crime of rape but that he could try the case fairly and impartially upon the law and the evidence, and the court overruled the challenge for cause, and defendant thereupon exhausted his peremptory challenges on said juror, but thereafter the court on reconsideration held that said juror was subject to challenge for cause, and granted the defendant an additional peremptory challenge, there was no error.

**3.—Same—Evidence—Outcry—Identification—Withdrawal of Testimony.**

Where upon trial for rape, testimony was admitted that some time after the alleged rape prosecutrix told her aunt that defendant had raped her, but the court thereafter withdrew from the consideration of the jury the fact of the identification of defendant and simply left the question of outcry without any details before the jury, there was no error; there being no issue as to want of consent or that any one else than defendant had committed the offense.

**4.—Same—Argument of Counsel.**

Where upon trial for rape the counsel for the State in response to argument made by defendant's counsel incidentally referred to testimony which had been withdrawn from the jury by the court, to which the defense objected but submitted no instruction to have same withdrawn, and the remarks of State's counsel were not of such character as to impair the rights of defendant or prejudice his case before the jury, there was no error.

**5.—Same—Charge of Court—Attempt to Rape—Assault with Intent to Rape —Sufficiency of the Evidence.**

Where upon trial for rape the evidence showed that the prosecutrix was under the age of fifteen years at the time of the outrage; that defendant assaulted her and there were incontestable facts that he outraged her, the conviction was sustained for rape. and the court was not required to submit to the jury the issues of attempt to rape, or assault with intent to rape.

Appeal from the District Court of Baylor.   Tried below before the Hon. Charles E. Coombes.

Appeal from a conviction of rape; penalty. fifty years imprisonment in the penitentiary.

The opinion states the case.

*Aynesworth, Glassgow & Nugent,* for appellant.—On question of intent to rape, and assault with intent to rape: McAdoo v. State, 35 Texas Crim. Rep., 603.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—Appellant appeals from a conviction had in the District Court of Baylor County on a charge of rape, obtained in said court on the 13th day of August, 1908, in which his punishment was assessed at confinement in the penitentiary for fifty years. The offense is alleged to have been committed in Motley County on the 5th day of July of the same year. The indictment was returned by the District Court of Baylor County on August 4, 1908.

1. The first question raised questions the validity of the indictment so returned by the last-named county. This is authorized by the terms of the Act of the Legislature passed on the 18th day of June, 1897. It is objected by appellant that this Act of the Legislature contravenes article 3, section 56, of the State Constitution, and is also violative of the Federal Constitution. All the questions raised touching this matter, by appellant, were carefully considered in the case of Mischer v. State, 41 Texas Crim. Rep., 212, and were ruled adversely to appellant's contention. It was there held, in substance, that the Act of June 18, 1897, Special Session Twenty-Fifth Legislature, p. 16, providing that prosecutions for rape may be commenced and carried on in the county in which the offense was committed, or in any county of the judicial district in which the offense was committed, or in any county of the judicial district the judge of which resides nearest to the county seat of the county in which the offense is committed, is constitutional. It is certain that there is no provision of our State Constitution prohibiting the Legislature from authorizing a prosecution for an offense in this State in some county other than the county where the offense was committed, and that article 3, section 45 of our State Constitution, which vests in the courts the power to change the venue in civil and criminal cases, and section 56, which prohibits the Legislature from passing any local or special law, authorizing such change of venue, do not prohibit the enactment of a law authorizing the prosecution of an offense in another county than that in which said offense was committed, as is provided in case of rape by the Act in question. It is there clearly held that said Act is not in derogation of the Sixth Amendment to the Constitution of the United States, requiring that criminal prosecutions shall be tried in the district wherein the crime shall have been committed, because that provision is a limitation and restriction which applies only to federal procedure, and is not binding with reference to the procedure in State courts. The opinion of Judge

Henderson touching this matter is so exhaustive, is so sound and clear, and it is so well supported by authority, that we can add nothing to it. We believe it to be a clear and correct enunciation of the law, and that it should be, as it has been, followed.

2. On the trial numerous objections were made to the competency of certain jurors. The only one of these jurors as to whom a challenge for cause could be sustained, and who was rejected on peremptory challenge, was thereafter on reconsideration held by the court to be subject to challenge for cause, and an additional peremptory challenge by the court granted. So that if there was no error in the proceedings of the court in respect to the juror, J. E. Morris, none of these matters can be complained of by appellant. This juror in a general way expressed himself as having a prejudice against the crime of rape. He stated, in substance, that it did not extend to the person charged, but, as we understand, was rather expressive of his abhorrence and detestation of the offense itself. His testimony, given on his examination, is not wholly consistent, because in part of it, as we understand, he states he would require the appellant to produce evidence to vindicate himself. However, on re-direct examination, and as a summary of his final attitude in the matter, he says: "At this time I do not know one thing in the world about the facts of this case, and I would not be influenced by any prejudice in making up my verdict in the case. I have never been a peace officer. In my present frame of mind I am weighing the fact that he is charged with the offense of rape against him. I know nothing whatever about the case, and do not know the defendant in this case. If I go into the jury box I would have to give the State and the defendant alike a fair and impartial trial, and I would require the State to make out her case beyond a reasonable doubt, and if the State failed to make out her case beyond a reasonable doubt I would turn him loose. I have no prejudice against the defendant on account of him being charged with rape. I could set aside my prejudice against the crime of rape and give the defendant a fair trial." This bill is approved, with the statement and explanation that the defendant exhausted his challenges on the jurors Rhea, Renner, Tipton, Welch and Frazier, being his challenges Nos. 11, 12, 13, 14 and 15, without asking any of said jurors any questions whatever, when the court allowed the said defendant his 16th challenge in lieu of the one exhausted on the juror C. H. Mitchill; and the said 16th challenge was exhausted upon the juror J. E. Morris. We think there was no error in the action and ruling of the court in respect to this matter. While this juror does, in part of his testimony, express great prejudice against the crime of rape, and his examination, in some portions of it, is consistent with the idea that his prejudice is so great that it might extend to the defendant himself, and implies a prejudgment of his cause, after all, as we believe, it is but an expression of his sense of outrage at the too frequent cases of rape occurring over the country. This is such a feeling as would, we believe, apply to many men, if in-

deed not most good men, and to find and empanel a jury composed only of persons having no prejudice or feeling of horror in respect to a crime of this sort would only result in empaneling a jury that ought not to be allowed to try any case. We believe, and therefore hold, that there was no such error in respect to this matter as would, or ought to, prejudice appellant.

3. Again, complaint is made at the action of the court in admitting in evidence the testimony of the witness Mrs. Thomas, an aunt of the prosecutrix, Gladys Thomas, to the effect, in substance, that on the day in question, and a short time after the rape was accomplished, prosecutrix made complaint to her aunt, and told her that appellant had raped her. That it was competent for her to make an outcry, without giving the details of the transaction, of course, is evident. The complaint, as we understand, extends only to the fact that she identified appellant as being the person who had accomplished her outrage. This, while admitted at the time offered, was subsequently withdrawn by the court from the consideration of the jury, and in view of the fact of the certainty of her outrage, and that there is no suggestion that it was, or could have been done by anyone else; in view of the fact that the matter of resistance was not an issue in the case, she being less than fifteen years of age, and the withdrawal of the incompetent testimony by the court and his instruction to the jury not to consider it, we do not think that the matter is of such gravity as could have injured appellant.

4. Complaint is also made of the improper argument of counsel for prosecution. The matter arose in this way, as appears by the bill of exceptions: Hon. L. W. Dalton, in his closing argument, made the following statement to the jury: "Judge Glasgow, in his argument before you, stated that the prosecutrix, Gladys Thomas, asked Mrs. Carrie Thomas what effect turpentine had upon any one, and that Mrs. Thomas then questioned her, and that prosecutrix then for the first time complained that she had been ravished. We objected to this argument of defendant's counsel, and appealed to the stenographer, and such was found not to have been the testimony of Mrs. Thomas. You will remember, gentlemen, that I asked Mrs. Thomas if Gladys made any complaint about having been raped, and that she testified that Gladys complained to her that defendant, John Dies, had raped her, and that the court, upon the defendant's objection, instructed you not to consider that part of Mrs. Thomas' testimony that related to any complaint about the defendant—that you could only consider that part of Mrs. Thomas' testimony that Gladys had made complaint to her that some one had wronged her, but as to who she stated it was could not be considered by you." Appellant excepted to these remarks of counsel, and stated to the court that said remarks of counsel were improper in view of the court having excluded the testimony; and the court did not reprimand counsel, nor instruct the jury to disregard the remarks so made by him. This bill is allowed with the explanation

"that no written instructions were presented to me by defendant's counsel instructing the jury to disregard the remarks of State's counsel." We do not see that the remarks complained of were of such highly improper character as necessarily to have prejudiced appellant's cause. Counsel for the State seems to have been replying to what he claims was the inaccuracy of some statement by Judge Glasgow, and to have undertaken to remind them that, in the court's ruling on this matter, he had held that the witness could not be permitted to say who had made the assault upon her, but that testimony was limited solely to the fact that an assault was made. Again, if in any event the remarks of counsel were improper, it was the duty of counsel for appellant to have asked a written instruction withdrawing same. That this is ordinarily the rule is settled beyond any sort of doubt or controversy. Jackson v. Stone, 18 Texas Crim. App., 586; Watson v. State, 28 Texas Crim. App., 34; McKinney v. State, 31 Texas Crim. Rep., 583; Jones v. State, 33 Texas Crim. Rep., 7; Morrison v. State, 40 Texas Crim. Rep., 473; 51 S. W. Rep., 358; Willis v. State, 55 S. W. Rep., 495, and Wilkerson v. State, 57 S. W. Rep., 956. The only exception to this rule is in cases where the remarks of counsel are obviously of a character to impair the rights of defendant or prejudice his case before the jury, in which case it has sometimes been held that it is not indispensable that a charge be requested instructing the jury to disregard the objectionable argument. Such a rule was held to be applicable in the case of Davis v. State, 54 Texas Crim. Rep., 236; 114 S. W. Rep., 366.

5. Vigorous complaint is made that the court erred in not submitting to the jury the issue and question of attempt to rape and assault with intent to rape, and in this connection it is also insisted that the evidence is sufficient to support the verdict. We do not believe that either of these contentions can be sustained. It is inconceivable to us that with the injury suffered by prosecutrix, young, untutored and inexperienced as she was, that, though the assault may have deprived her of consciousness, when this was regained, that she could have been left in the slightest doubt of her defloration. The court gave the law in his charge on circumstantial evidence, but the circumstances of the injury to her parts, in the light of the physician's testimony, make as certain as any fact in human experience can be that this little girl suffered this horrible outrage at the hands of this appellant. But, for a proper review of this question, it is essential that a fuller statement of the case, with its details, should be given than ordinarily it is the writer's custom. The facts, as they are found in the statement of facts, are substantially as follows:

"Gladys Thomas was the daughter of Horace Thomas and wife, who lived at Matador, in Motley County. He and his wife were married on June 15, 1893, and Gladys Thomas was born on December 30, 1895, and it may be stated here that there is no question as to the age of this child, and that, at the time of the alleged rape, she was under the

age of fifteen. At the time of the alleged rape the appellant was work-
ing as a hired man for the prosecutrix' father. On Friday, July 3d,
prosecutrix' father and mother left their home to go to Northfield, to
be gone three or four days, leaving at his home his three girl children,
his wife's brother, Will Hendricks, and appellant, with the understand-
ing that at nights the girls were to go over to their uncle's and stay
there at night, and would come back in the day to attend to the mat-
ters around the place. On Sunday, July 5th, Hendricks, early in the
morning, left, leaving appellant at the house. About 9 o'clock Sunday
morning the prosecutrix, with her sister, left Dr. Thomas', where they
stayed all night, to go home to attend to the matters there and get
their Sunday clothes to go to church. Jesse, the sister of Gladys, a
child about nine years old, got her clothes, and went on to her aunt's
home, leaving her sister there to attend to such matters as were neces-
sary. The prosecutrix started to go to milk the cows; the appellant
informed her that the cows had already been milked, and this witness,
continuing, says: 'After Jesse left I said I would go and attend to
the things, and appellant said there was nothing to attend to—that
they had attended to everything. I said if there was nothing to attend
to I would go back. When I said this I was in the sitting room. At
this time he did not do anything, and I turned and walked into my
room and went to getting my clothes together to go back to Dr.
Thomas'. I did not get my clothes together; I just started to get
them up when he came into the room. He spoke to me and asked
me if I did not want to have a good time with him, and took me by
the arms with his hands, and I told him I wanted him to turn me
loose; he took hold of me around the shoulders—just caught me round
the shoulders, both of them—and he made this talk while taking hold
of me: asked me if I wanted a good time, and I told him 'No.' I
says, 'No, sir; I want you to turn me loose. Turn me loose or my papa
will kill you.' I says, 'Turn me loose or I will send you to the peni-
tentiary.' He says, 'I would not do anything to hurt you for any-
thing.' I said, 'I don't care if you don't, I want you to turn me
loose.' He threw me down on the bed and got on top of me. He did
not pull up my dress while I knew anything; he just kept holding me
there and I was trying to get up; he was on top of me; I was trying
to get away all of the time. I was lying cross-ways of the bed. After
he threw me across the bed I kept struggling, and I knocked one of
the window-panes out, and that is the last thing I remember until I
was out and standing in the door, I think, after he threw me in the
bed, only I was trying to get up; and while I was trying to get up
I got hold of the bed, and I knocked one of the window lights out, and
that is the last thing I remember until I was up, and standing in the
door between my room and the sitting room; the last thing I remember
he was on top of me, and all this occurred. After I got up I did not
say anything at all, but walked into the kitchen and commenced hunt-
ing some tooth paste, and he came in there and asked me what I was

hunting, and I told him, because I was afraid not to; I was afraid of him. He asked me what I wanted the tooth paste for, and I told him I had a very bad taste in my mouth—that something smelled bad. He told me that was my mouth. He said if I would take some turpentine that would cure it—kill that scent. At that time I had a peculiar. feeling. Between the time that he came into the room where I was and the time that I was out in the kitchen I know that something had been done to me. I knew that somebody had had intercourse with me. I could not hardly walk. I sorter had pains in the lower part of my stomach. When I got up from the bed one of my drawers legs had been pushed up. I saw semen on me there, and felt it on me wet. He told me about this turpentine just as soon as I got in the kitchen, and wanted me to take a tablespoonful. I would not take a tablespoonful, but took a teaspoonful only because I knew that turpentine was strong, and he told me to take it, and I was afraid not to take it. He had never had sexual intercourse with me before that. After I took the turpentine I went back into the sitting room where I was when I first came. I was sick then. I never did give my consent to John Dies to do me that way. After that I washed myself with salt water; I washed with salt water because he told me to; he told me to wash in salt water and nothing would ever happen to me. When he told me that if I would wash myself in salt water nothing would ever happen to me I went and bathed myself. I pulled my drawers off, and then put them back on. I wore my drawers the rest of that day until I got to Dr. Thomas'. I left home just as soon as Dies got away from the place. Just as soon as he told me to wash myself in salt water he left the place, and then after that I left just as quick as I got dressed, and I went from there to Dr. Thomas', my aunt's home, to tell her, and she was not there, and then I went from there to the Baptist church, and she was not there; and then I went on down to where she was at the Methodist meeting. I did not stay at the Sunday school, but I went on to the church and waited till she came. There was a right smart crowd there, and I could not find her. I thought I saw her coming and I waited till she got there. I did not tell her when she got there, because when she came she went over in the back of the choir in the back of the house, and I did not want to go to her, and Dies was sitting back in the house himself. Just as soon as she came home after church I told her about it. I got sick and left church before it was over. It was a right smart little while after I got home before my aunt came."

Dr. Traweek testified that on the evening of July 5th, about four o'clock in the evening, he made an examination of the girl, and stated that he found fresh lacerations of the hymen and lacerations of the vaginal sac. It showed to be red, and to some extent inflamed, and slightly swollen. Her female organ indicated from its looks that she had been recently penetrated—within the last few hours; her hymen was penetrated and bruised slightly. The parts were slightly bruised,

and had a bluish discoloration from them. I based my conclusion that penetration made recently was the cause of this laceration on account of the dilation of the parts, standing open, and next, on account of the freshness of the wound. This doctor's testimony, if anything, on cross-examination, instead of weakening the force of his examination-in-chief, rather tended to strengthen the same.

The evidence of other witnesses shows that the bed on which the assault was charged to have been committed was disarranged, and the window glass broken out, as stated by Gladys Thomas. The evidence shows that she was at the house about the time she testifies she was assaulted, and that appellant was there, and that they were alone. That she was under the age of fifteen years is shown by all the testimony. The record further shows that appellant had been living at the residence of prosecutrix' father for some months on friendly terms. That this young girl was set upon by appellant, and ravished without her consent, is as incontestably shown by such irrefragible evidence as, to our minds, admits of no doubt or question. We can not agree with counsel for appellant that the penalty is excessive. On the other hand, as the evidence appears to us, the jury was both gracious and merciful in the fact that they spared his life.

We have carefully examined the record, and there is, in our judgment, no question raised on which we could or should reverse the judgment of conviction. It is, therefore, in all things affirmed.

*Affirmed.*

[Rehearing denied April 14, 1909.—Reporter.]