Johnny Eduardo **SWIFT**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 48313.

Court of Criminal Appeals of Texas.

May 22, 1974.

Frank M. Fitzpatrick, Jr., Waco, for appellant.

Martin D. Eichelberger, Dist. Atty., Waco, Bryan F. Russ, County Atty., Hearne, Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

GREEN, Commissioner.

Appellant was convicted of murder with malice of H. C. Kelly. His punishment was assessed at 101 years.

This case was tried in the 54th District Court of McLennan County on a change of venue from the 20th District Court of Robertson County.

Appellant initially contends that the court erred in overruling his motion to quash the indictment because the grand jury commission which selected the grand jury that returned the indictment was made up in such way as to constitute racial discrimination. The record discloses that appellant is a Negro, and there were no Negroes on the grand jury commission. Evidence of the county attorney of Robertson County disclosed that to the best of his recollection, he did not think there had ever been a Negro on a grand jury commission in Robertson County. He estimated that one-third of the population of Robertson County is colored.

Appellant does not contend that discrimination was practiced in Robertson County in the selection of grand jurors, nor does he deny that Negroes served on the grand jury which returned this indictment.

■ This Court has consistently held that the mere fact that no Negro was appointed on the jury commission is not sufficient to show discrimination. For racial discrimination in the selection of the commissioners to be established, it must be shown that such discrimination invaded into the work of the commissioners in the selection of the lists from which the grand jurors are chosen. Lamkin v. State, 165 Tex.Cr.R. 11, 301 S.W.2d 922, cert. denied, 355 U.S. 59, 78 S.Ct. 137, 2 L.Ed.2d 107, rehearing denied, 355 U.S. 908, 78 S.Ct. 335, 2 L.Ed.2d 263; McMurrin v. State, 156 Tex.Cr.R. 434, 239 S.W.2d 632, cert. denied, 342 U.S. 874, 72 S.Ct. 115, 96 L.Ed. 657; Morris v. State, 158 Tex.Cr.R. 516, 251 S.W.2d 731, cert. denied, 345 U.S. 951, 73 S.Ct. 863, 97 L.Ed. 1374; Williams v. State, 167 Tex.Cr.R. 503, 321 S.W.2d 72, cert. denied, 359 U.S. 930, 79 S.Ct. 615, 3 L.Ed.2d 632; McNair v. State, 159 Tex. Cr.R. 405, 265 S.W.2d 105; Addison v. State, 160 Tex.Cr.R. 1, 271 S.W.2d 947; Oliver v. State, 155 Tex.Cr.R. 461, 236 S. W.2d 143.

The first ground of error is overruled.

Viewing the evidence most strongly in favor of the verdict, the record reflects the following:

H. C. Kelly, sometimes known as Jack Kelly, was, on May 17, 1972, Chairman of the Board of Directors of the Planters' and Merchants' State Bank of Hearne, and lived with his wife in Hearne. He attended to his duties at the bank on Tuesday, May 16, 1972, but failed to appear on the following day. Investigation of his home by friends on the 18th disclosed that he, his wife and 19 year old daughter, Nancy Kelly Stovall, had been killed, and their bodies were found in separate bedrooms. Dr. Jachimczk, Chief Medical Examiner of Harris County, was immediately called to the scene, and his examination disclosed that each had been stabbed and cut with a sharp instrument numerous times. H. C. Kelly's death was caused by two wounds in the back, made, in the doctor's opinion, with a knife having a blade at least four inches long. Mrs. Kelly suffered many knife wounds, and was found with an electric cord around her neck, which was broken. Cause of death was strangulation. Nancy's body had sixteen knife wounds, and her neck also had an electric cord around it, and was broken. Dr. Jachimczk estimated that Kelly had been dead for about 36 hours, and that the time of death was between 11:00 P.M. May 16 and 1:00 A.M. May 17.

Dwight Williams, 27 years old, testified that he had known Lee Murry Jurode for a number of years, and that Jurode, who formerly lived in Hearne, had lived in Albuquerque, New Mexico, for the past four years. About 8:00 P.M. on Tuesday, May 16, he was in Hearne in front of Hurt's Grocery Store when he saw Jurode arrive in company with appellant and a "Spanish guy." Jurode introduced appellant to Williams, who told him that they planned to go over to H. C. Kelly's home, hold his wife as hostage, take Kelly to the bank and rob "it." He asked Williams to join them. Williams refused to do so.[1] Later that night, Jurode came to Williams' home and asked him to help in their plan to take Kelly to the bank to rob "it." Again Williams refused.

Wilford Hammond, 21 years old, had known Jurode for about 15 years. He saw Jurode at the Bossanova Club in Hearne Sunday night, May 14th, in company with appellant, a "Spanish fellow," and a "colored lady." Jurode approached him and stated that they were going to Kelly's home to get Kelly to go open the bank so they could rob "it," and if he refused, they were "going to shoot and cut them and tie them up." Hammond declined to join them. One or two nights later, at the Sunset Strip, Jurode again asked Hammond to join them, and again he refused. Hammond testified that he tried to contact the sheriff, but could not reach him. At this second time, Jurode told Hammond they were going to use the Mexican boy to try to get in the house.

Jo Ann Adams, 24 years old, testified as a State's witness. On May 13, 1972, she, appellant, Lee Murry Jurode, and Robert Duron left Albuquerque, New Mexico, where she had been living with appellant, in a white Pontiac headed for Hearne. Appellant stated that they were going to Hearne to "rob a bank." Appellant told her that they would "rob the bank" and lock the old man in the vault while Jurode and Duron stayed in the house with his wife and daughter. They arrived in Hearne about 6:00 P.M. on Sunday, May 14, and went to "The Hill," a section of Hearne. She stayed in the car while the men talked to some people, and then they left, this time for Oklahoma City. Staying there only a short time, they left to go back to Hearne, arriving there some time on Tuesday the 16th. All four had been together all of this time. After another visit to "The Hill," the men took her to a

---

1. Williams had twice been convicted of burglary, and at the time was on bond charged with a felony.

friend's apartment, left her there, and later that night returned and got her. They left together in the Pontiac and drove to Oklahoma City again. There they rented an apartment. A number of guns, three suitcases, a fur stole, and other articles were taken from the trunk of the car into the apartment. While there, appellant told her that at Hearne he had killed Kelly, Duron had killed Kelly's wife, and Jurode had killed the daughter.

Lieutenant N. A. Maxwell of the Oklahoma City Police Department testified that on May 22, 1972, he, with four other police officers, went to an apartment on the northwest corner of the second floor of the building located at 140 East Park Street in Oklahoma City armed with a search warrant, issued on an affidavit made by Lee Murry Jurode. At the time, appellant was in custody. The officers entered by using a key to the door given Maxwell by Jurode. In the room, in plain view, they found a number of articles which were seized and taken to the police station. Proper custody was established, and they were introduced in evidence. They included among others the following:

A Phillips Petroleum Company credit card made out to H. C. Kelly;

A BankAmericard issued to Henry C. Kelly;

A watch with the inscription "P & M Employees 1969," identified by James Florance, President of the Planters' and Merchants' State Bank of Hearne as having been given to deceased in 1969;

A mink stole with the name "Reo Kelly" [2] embroidered on the collar;

A suit of men's clothing with a laundry tag containing the name of "Jack Kelly," and the trade mark of Conway & Co. of Bryan, Texas. This suit was identified by the witness Florance as being one frequently worn by deceased in his work at the bank;

A rifle identified by Florance as being deceased's deer hunting gun;

A check with writing recognized by Florance as being that of Mrs. Kelly.

A palm print on one of the guns which, when compared with a known print of appellant, was identified by a qualified expert as being that of appellant.

The appellant did not testify before the jury. He offered only one witness, an Oklahoma City officer, whose testimony was completely negative.

In his ninth ground of error, appellant contends that the evidence is insufficient to support the verdict. Appellant, in a very brief discussion, seems to argue that the testimony of the accomplice witness Jo Ann Adams, was not sufficiently corroborated by other evidence to justify submitting the case to the jury.

In his eighth ground, appellant complains of the court's failure to charge on circumstantial evidence, as requested by appellant.

The court instructed the jury that if an offense was established Jo Ann Adams was an accomplice witness as a matter of law, and properly charged the jury on the necessity of corroborating accomplice testimony. We have heretofore summarized the evidence. Jo Ann Adams described the activities of her companions, including appellant, and testified that appellant admitted to her that he killed deceased H. C. Kelly. It was necessary, under the established rules of corroboration of the testimony of an accomplice witness, to eliminate the evidence of Jo Ann, and examine evidence of other witnesses to ascertain if there be inculpatory evidence of incriminating character which tends to connect the accused with the commission of the crime. Chambers v. State, Tex.Cr.App., 508 S.W. 2d 348 (1974); Cherb v. State, Tex.Cr. App., 472 S.W.2d 273.

We have reviewed the evidence as above set forth, and find that the testimo-

2. Deceased's wife.

ny of non-accomplice witnesses is amply sufficient not only to tend to connect the appellant with the commission of the offense, but also sufficient to support the verdict even in the absence of the testimony of Jo Ann Adams.

■■■ We also find that it was not error for the court to refuse to charge on circumstantial evidence. Jo Ann testified that appellant told her he had killed H. C. Kelly, the deceased. A charge on circumstantial evidence need not be given where there is evidence of an admission by the accused that he killed the deceased. Hogan v. State, Tex.Cr.App., 496 S.W.2d 594; Corbett v. State, Tex.Cr.App., 493 S.W.2d 940; Steel v. State, Tex.Cr.App., 459 S.W.2d 649. Where there is direct testimony, although it comes from an accomplice witness, a charge on circumstantial evidence is not required. Bradley v. State, Tex.Cr.App., 450 S.W.2d 847; Blankenship v. State, Tex.Cr.App., 448 S.W.2d 476; Byrd v. State, Tex.Cr.App., 435 S.W.2d 508; White v. State, Tex.Cr.App., 385 S.W.2d 397.

The eighth and ninth grounds of error are overruled.

In six grounds of error (Nos. 2 to 7 inclusive) appellant complains of the introduction of evidence of the search of his apartment in Oklahoma City, and of the fruits of such search. He contends, as he did in the trial court, that anything taken out of the apartment was taken "as the result and the product of an illegal search and seizure." He points out that he was under arrest in jail when the search warrant was issued, and that it was not served on him, and that there were no exigent circumstances shown. It is his further contention that the search warrant was void, being not in compliance with the requirements of Articles 15.05 and 18.13, Vernon's Ann.C.C.P., and that there was insufficient evidence that the law of Oklahoma was any different from the law of Texas on the requirements of a search warrant.

It is not necessary that we pass on the validity of the search warrant in our disposition of these grounds of error. We find, from the evidence, that the officers, in making the search in question and seizing the various articles heretofore mentioned in this opinion, were acting with proper consent voluntarily given by Jurode, who had authority to give consent.

The record reflects that from the time appellant, Jurode, Duron and Jo Ann Adams arrived in Oklahoma City to their arrest they jointly occupied the apartment which was searched.

Jo Ann Adams testified that she had been living with appellant since March, 1972, in Albuquerque. She said the four participants in this offense; i. e., she, appellant, Jurode and Duron, left Albuquerque together on May 13 headed for Hearne with the idea of robbing a "bank." They were together at all times, except for the brief period Tuesday night when she was left with a friend, until they they were arrested in Oklahoma City. In the latter city, "we" moved into the apartment, where she and appellant slept in one room, and Jurode and Duron slept in another.

Lieutenant Maxwell, who headed the search group of officers, testified out of the presence of the jury that Jurode had voluntarily surrendered in Oklahoma City after calling a police officer in Albuquerque. Jurode, after being duly advised of his rights, gave Maxwell the key which Maxwell used to get into the apartment. Maxwell testified as follows:

"Q How did you gain excess (sic) to this apartment—how did you get in the apartment door?

"A I unlocked the door and walked in.

"Q You had a key to the apartment door?

"A Yes, sir.

"Q Where did you obtain the key?

"A I obtained it from Lee Jurode.

"Q Lee Jurode had a key to the apartment?

"A Yes, sir, he did.

"Q All right. Did you discuss with Lee Jurode whether or not he lived in that apartment?

"A Yes, sir.

"Q What did he tell you?

"A He said he did.

"Q Did you believe him?

"A Yes, sir, I did.

"Q Did Lee Jurode give you consent to search his apartment?

"A Yes, sir, he did . . . .

\*  \*  \*  \*  \*  \*

"Q Did Lee Jurode give you the key to the apartment subsequent to being warned of all of his constitutional rights?

"A Yes, sir, that's correct.

"Q If you know, officer, was Lee Jurode in custody partly through his own act? Did he try to get in custody?

"A Yes, sir, he did.

"Q Was it your information that he had phoned a Lt. Fisk in Albuquerque, New Mexico?

"A Correct. Yes, sir.

"Q And this was the only reason that you all knew where he was and how to arrest him, is that correct?

"A That's correct. Yes, sir." [3]

Appellant, out of the presence of the jury on his motion to suppress, testified

3. In addition, Jurode signed the affidavit attached to the search warrant and neither

the affidavit nor the warrant contained any names of who occupied the apartment.

that he rented the apartment, paid the rent, and that the others were his guests.

The evidence of Jo Ann Adams in the instant case clearly reflects that the four members of the group were, in all of the incidents connected with this offense, acting together. All were occupants of the apartment in Oklahoma City, and were jointly using same. Except for appellant's testimony, which the trial court could believe or reject, the record reflects that Jurode had equal rights with appellant concerning the apartment. The record reflects that his handing the officer the key, and giving his consent to the voluntary search, was not in any manner caused by coercion.

██ ██ It is well established in Texas that third parties have authority to consent to a search when they have equal control over and equal use of the premises being searched. Lowery v. State, Tex.Cr.App., 499 S.W.2d 160; Jemmerson v. State, Tex.Cr.App., 482 S.W.2d 201; Sorensen v. State, Tex.Cr.App., 478 S.W.2d 532; Powers v. State, Tex.Cr.App., 459 S.W.2d 847; Burge v. State, Tex.Cr.App., 443 S.W.2d 720, cert. denied 396 U.S. 934, 90 S.Ct. 277, 24 L.Ed.2d 233; Cass v. State, 124 Tex. Cr.R. 208, 61 S.W.2d 500. See also Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; Gurleski v. United States, 405 F.2d 253 (5th Cir.). The burden is on the State to show by clear and convincing evidence that the consent was freely and voluntarily given. Allen v. State, Tex.Cr. App., 487 S.W.2d 120.

██ Although the evidence of Officer Maxwell concerning Jurode's consent to the search came after the court had admitted the fruits of the search in evidence, error, if any, was rendered harmless, since the evidence would have been admissible in view of the subsequent testimony of Maxwell. Johnson v. State, Tex.Cr.App., 494 S.W.2d 870; Gilmore v. State, Tex.Cr. App., 493 S.W.2d 163.

In United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court said:

"In Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1972), the Court reaffirmed the principle that the search of property, without warrant and without probable cause, but with proper consent voluntarily given is valid under the Fourth Amendment. The question now before us is whether the evidence presented by the United States with respect to the volunary consent of a third party to search the living quarters of the respondent was legally sufficient to render the seized materials admissible in evidence at the respondent's criminal trial."

The facts of that case were that respondent Matlock was arrested in the yard in front of the home of Mr. and Mrs. Marshall. Living in the home were Mrs. Marshall, several of her children including Mrs. Gayle Graff and her son, and Matlock. Although Gayle and respondent were not married to each other, they shared the same bedroom, sleeping together there, and clothes of both were in the room. There was evidence that respondent had on occasion introduced her as his wife. Immediately after the arrest of respondent, three officers went to the door of the house and were admitted by Gayle Graff. They hold her they were looking for money and a gun, and, according to the officers' testimony at the hearing to suppress she voluntarily consented to a search of the house,[4] including the bedroom which she said was occupied jointly by herself and respondent. The officers found a large sum of money in the house.

Matlock was indicted in the Federal Court for bank robbery. The issue on the hearing of respondent's motion to suppress the seized evidence was whether the hearsay evidence of the officers showed sufficient relationship to the bedroom as to make her consent valid against respondent, and whether such evidence being hearsay was admissible at the hearing to prove the truth of the facts stated therein. The district court held that it was not admissible.

The Court of Appeals (7th Circuit) affirmed an order of the trial court suppressing this evidence. 476 F.2d 1083.

The Supreme Court, in reversing the judgments of the Court of Appeals and the trial court, and remanding the case to the district court for reconsideration in light of its opinion, held that "the voluntary consent of any joint occupant of a residence to search the premises jointly occupied is valid against the co-occupant, permitting evidence discovered in the search to be used against him at a criminal trial" cited many cases, Federal and State, including Gurleski v. United States, 405 F.2d 253 (5th Cir.), and Burge v. State, 443 S. W.2d 720 (Tex.Cr.App.).

The Court further stated that recent authority "clearly indicates that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared," citing Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 24 L.Ed.2d 233.[5]

The Court also held that the hearsay statements of Mrs. Graff's giving consent for the search, although not admissible before the jury, were admissible before the trial court to assist in determining the issue of voluntary consent where the trial court can accord the evidence such weight as it deems desirable. In this regard, the Court said:

"As for Mrs. Graff's statements to the searching officers, it should be recalled that the rules of evidence normally appli-

---

4. Mrs. Graff, at the hearing, denied that she gave consent. The district court found that she was not advised of her right to refuse consent, but the Supreme Court held that such warning was not necessary.

5. In *Matlock*, supra, the evidence showed that after the first search the officers returned on two occasions that same day to renew their search of the premises.

cable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence," citing Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.

■ Since in the instant case the search of the premises was made with the voluntarily given consent of one authorized to give such consent, appellant's grounds of error Nos. 2 to 7 inclusive are overruled.

The judgment is affirmed.

Opinion approved by the Court.