**Thomas A. BAREFOOT aka Darren Callier, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 63715.**

Court of Criminal Appeals of Texas, En Banc.

March 12, 1980.

Rehearing Denied April 30, 1980.

Stephen E. Blythe, Gerald M. Brown, Temple, for appellant.

Arthur C. Eads, Dist. Atty., Ralph Petty, Jr., James T. Russell and Steven C. Copenhaver, Asst. Dist. Attys., Belton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for capital murder. The punishment is death.

Appellant contends that the trial court erred by failing to instruct the jury at the guilt-innocence stage of the trial on the law of circumstantial evidence, denying his motion for change of venue, overruling his challenges for cause of three prospective jurors, refusing his request for additional peremptory challenges, admitting evidence of extraneous offenses, failing to define "probability" in the charge at the punishment stage, and overruling his objections to the testimony of two witnesses as to the probability he would commit acts of violence in the future. Appellant also contends that Art. 37.071, V.A.C.C.P., is unconstitutionally vague.

Appellant was convicted for the murder of Harker Heights police officer Carl Levin. The appellant fatally shot Levin after the officer stopped him for questioning in an arson investigation. Although appellant does not contest the sufficiency of the evidence, a detailed review of the testimony is required in order to discuss his contention that the circumstantial evidence charge should have been submitted to the jury.

Appellant and four other persons were living in a trailer in Killeen during the summer of 1978. One of the appellant's roommates, Donnie Ray Tiller, testified that appellant had asked him for a gun and stated that he intended to kill a Harker Heights policeman who had allegedly mistreated him during an arrest for public intoxication. Appellant also told Tiller of his plans to commit various robberies in Harker Heights.

On August 6, 1978, appellant told Tiller that he was going to commit a robbery the next morning at the Oasis Club in Harker Heights after creating a diversion by bomb-

ing or setting fire to a building. Appellant stated to Tiller that he would kill anybody who recognized him as the robber. Appellant was wearing a white T-shirt and blue jeans at the time of this conversation.

Another roommate, Robert Roberson, testified that appellant awakened him at approximately 4:30 a. m. on October 7 and asked him for a ride to Harker Heights. Appellant was wearing a white T-shirt and blue jeans, and was armed with a .25 caliber automatic pistol and a home-made bomb. On the way to Harker Heights, appellant told Roberson he was going to blow up the Silver Spur, a night club. After first stopping at a convenience store where appellant filled an empty plastic milk jug with gasoline, Roberson dropped appellant off near the Silver Spur at about 5:00 a. m. and returned to the trailer.

John Edwards, a soldier at Fort Hood, drove past the Silver Spur at 5:15 a. m. He saw flames coming from the roof and a man he identified as appellant standing in the parking lot. As Edwards watched, appellant began to run along Highway 190. Edwards drove to the police station, which was nearby, to report the fire and then returned to the Silver Spur. On his way back to the fire, Edwards saw appellant near the intersection of Highway 190 and Amy Lane.

Back at the fire, Edwards saw a fireman remove a melted plastic jug from the roof of the building. He then told Officer Levin what he had seen. Levin, who was in uniform and driving a marked patrol car, left the scene of the fire and drove toward Amy Lane.

Michael Thrash, another Fort Hood soldier, lived on Amy Lane. He was walking to work at 5:35 a. m. when he saw a patrol car parked at the intersection of Amy Lane and Valley Road with its emergency lights on and its spotlight trained on some bushes. Officer Levin was standing beside the patrol car. A man wearing a white T-shirt and blue jeans stepped out of the bushes and walked toward the officer. The man

then shot Levin in the head at point-blank range and fled down Valley Road.

Mary Richards, who lived on Valley Road, heard the shot and looking through a window, she saw a man wearing a white T-shirt running down Valley Road from Amy Lane. Richards could not positively identify appellant, but testified he resembled the man she saw.

Appellant called Tiller at approximately 10:30 a. m. on the morning of the shooting. Tiller described the conversation as follows:

"I answered the phone. He said, Donnie, I said, yes. He said this is Darren. He says have you been listening to the news? And I said, yes, Darren, did you do that? He said, Yeah, I shot him. I killed the mother fucker. I shot him in the head."

Tiller testified that this conversation was in reference to the August 7 shooting of the Harker Heights policeman. After appellant hung up, Tiller contacted the police.

Appellant returned to the trailer after the shooting and spoke to Roberson. Roberson testified that appellant was still dressed in a white T-shirt and blue jeans, had red blotches which appeared to be blood on his face and shirt, and appeared to be in a state of panic. After Roberson told him that the police had been to the trailer looking for him, appellant said that "he had to get out of town because he wasted a cop, that he killed a cop." Asked by Roberson how he had done it, appellant reached for his back pocket and then pointed his finger at Roberson's head at the place corresponding to the bullet wound to the head of the deceased. After washing up and changing clothes, appellant left the trailer.

Francisco Hernandez testified that he met appellant in downtown Killeen on the morning of August 7. He invited appellant to his home for lunch and subsequently offered to let him spend the night. The next morning, after hearing a radio news report describing the suspect in the Levin murder, appellant told Hernandez that "I

am the one that they're looking for but I didn't kill no policeman."

Appellant subsequently made his way to Belton, where he boarded a bus for Houston. Police acting on information from Hernandez arrested appellant at the bus station in Houston at approximately 11:30 p. m. August 8. A .25 caliber automatic pistol that ballistics tests proved fired the bullet that killed Levin was in appellant's pocket at the time of his arrest.

David Kingsley was acting Chief of Police for Harker Heights at the time of the charged offense. He testified that Officer Levin was the only peace officer killed in Bell County on August 7, 1978.

 If the accused admits or confesses killing the deceased, proof of the admission or confession is direct evidence of the main inculpatory fact and a charge on circumstantial evidence is not required. *Sloan v. State,* 515 S.W.2d 913 (Tex.Cr.App.1974); *Hurd v. State,* 513 S.W.2d 936 (Tex.Cr.App. 1974); *Swift v. State,* 509 S.W.2d 586 (Tex. Cr.App.1974). However, if the admission or confession is equivocal as to the killing of the deceased, or if it is not clear that the killing admitted or confessed is the killing with which the defendant is accused, proof of the admission or confession alone will not relieve the trial court of the necessity of giving a circumstantial evidence charge. *Ridyolph v. State,* 545 S.W.2d 784 (Tex.Cr. App.1977); *Hielscher v. State,* 511 S.W.2d 305 (Tex.Cr.App.1974); *Martinez v. State,* 151 Tex.Cr.R. 316, 207 S.W.2d 387 (1948). Even if the confession is equivocal, a circumstantial evidence charge is not necessary if the other evidence, together with the confession, conclusively establishes that the killing confessed is the killing for which the defendant is on trial. *Ridyolph v. State,* supra; *Hogan v. State,* 496 S.W.2d 594 (Tex.Cr.App.1973); *Steel v. State,* 459 S.W.2d 649 (Tex.Cr.App.1970); *Patterson v. State,* 416 S.W.2d 816 (Tex.Cr.App.1967).

 Tiller testified that appellant's admission to him that he "shot him in the head" was in reference to the shooting of the Harker Heights policeman on August 7. Officer Levin, who was shot in the head, was the only peace officer in Bell County killed that day. Appellant told Roberson that he "killed a cop" and described the shooting in a manner consistent with the murder of Levin. Appellant was seen in the area a few minutes prior to the shooting wearing a white T-shirt and blue jeans, the witness to the shooting testified that the assailant was dressed in that fashion, and Roberson testified that appellant was so dressed when he returned to the trailer splattered with blood. These facts, together with the other evidence discussed above, leave no reasonable doubt that the killing admitted by appellant was that of Officer Levin. Therefore, the admissions are direct evidence of the main inculpatory fact and the trial court did not err in refusing to charge on the law of circumstantial evidence. See and compare *Ridyolph v. State,* supra; *Casey v. State,* 523 S.W.2d 658 (Tex. Cr.App.1975); *Hielscher v. State,* supra; *Hogan v. State,* supra; *Steel v. State,* supra; *Patterson v. State,* supra.

Appellant contends that the trial court erred by refusing his motion for a change of venue. Appellant argues that news accounts of the shooting had created such a prejudice against him that he could not obtain a fair and impartial trial in Bell County.

The trial of appellant commenced eighty-three days after the commission of the offense. The hearing on the change of venue motion was held September 20, 1978, forty-four days after the shooting. Six residents of Bell County testified that in their opinion appellant could not receive a fair trial in the county at the time of the hearing of the motion. However, four of these witnesses stated during cross-examination that they could be fair and impartial if selected as jurors. Appellant's other witnesses were employees of local newspapers and radio and television stations. Each described the coverage appellant's case had received and

identified copies of newspaper stories and transcripts of broadcasts that were admitted in evidence. On cross-examination, these witnesses stated that the purpose of their news coverage had been to inform, not to inflame, the public, that they believed appellant could receive a fair trial, and that they could be impartial jurors.

The State called eleven witnesses to testify that there was not such a prejudice against appellant in Bell County that he could not receive a fair trial. The State also introduced evidence showing that the county's population was between 125,000 and 158,000; that there were 45,000 registered voters in the county; and that the four largest cities in the county were Killeen, population 52,000, Temple, population 48,000, Harker Heights, population 10,500, and Belton, population 10,000.

■ The evidence raised fact issues whether appellant could obtain a fair and impartial trial in Bell County. These issues were decided adversely to appellant when the trial judge, as the trier of fact, overruled the motion for change of venue. *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App. 1978); *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977).

Although appellant did not renew his motion for change of venue, it is instructive to consider the voir dire examination of prospective jurors which began October 31, 1978. Both appellant and the State agree that of the 132 prospective jurors examined, 63 had heard something about the case through news reports and 21 had formed an opinion that appellant was guilty. They also agree that 11 of the jurors selected had heard about the case, but all testified that they could be fair and impartial and would base their verdict on the evidence presented in court.

Finally, we have examined the newspaper stories and broadcast transcripts in the record and find that they are factual and not inflammatory. They do not in themselves establish prejudice or require a change of venue. *Freeman v. State*, supra; *Knight v. State*, 538 S.W.2d 101 (Tex.Cr.App.1975).

We find no evidence that appellant did not receive a fair trial by an impartial jury free from outside influence. The trial court did not abuse its discretion in overruling the motion for change of venue.

■ Appellant contends that the trial court erred in overruling his challenges for cause to three venire members and in failing to grant his request for additional peremptory challenges. Two of these venire members, Johnnie Kopriva and Robert Latsha, were peremptorily challenged by appellant after his challenges for cause were overruled. Appellant subsequently exhausted his peremptory challenges and, after his challenge for cause to venire member James Smith and his request for additional peremptory challenges were overruled, was forced to accept Smith as a juror despite his declaration that Smith was an objectionable juror. Thus, appellant properly preserved the alleged errors. *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr.App. 1978); *Wolfe v. State*, 147 Tex.Cr.R. 62, 178 S.W.2d 274 (1944).

Appellant contends that venire member Kopriva was biased against a portion of the law on which appellant was entitled to rely. Specifically, he argues that Kopriva was unable to accept appellant's right to remain silent and present no evidence in his defense. This contention is based on the following voir dire examination by defense counsel:

"Q. Do you feel—and many people do, so you would not necessarily be in the minority—do you feel that a person accused of a criminal offense should be required to come in the courthouse and defend himself, stand up and defend himself?

"A. No, sir.

"Q. Do you feel that he should be required to put on any evidence of any type in the defense of his case?

"A. Yes, sir.

"Q. You feel that he should, sir?

"A. Yes, sir he should. His lawyer should put a defense on if that's what you mean.

"Q. Yes, sir. That's what I'm asking.

"A. Yes, sir.

"Q. You feel that way, even though the law allows for the defendant to sit silently and not put on any evidence?

"A. I don't think that I understand that question, sir.

＊　　＊　　＊　　＊　　＊　　＊

"Q. A moment ago you kind of indicated that you felt he should put on some evidence.

"A. I didn't understand the question, though.

"Q. All right. To make sure we understand then, you're saying that he does not have to put on any evidence to satisfy you?

"MR. EADS: Objection, Your Honor.

"THE COURT: Overruled.

"Q. If you will answer my question, please sir. You are saying again that a defendant, does not have to put on any evidence to satisfy you that he's not guilty?

"A. No, sir. I think the lawyers should present their evidence of the case because—

"Q. You can explain that answer if you would like to, sir.

"A. Well, even though the State proves its case and—well, I would still like to hear the other side of the story."

After this exchange with defense counsel, the prosecutor explained to the venireman the State's burden of proof and the defendant's *Fifth Amendment* privilege. Kopriva indicated that he understood and that he would not hold appellant's silence against him. Defense counsel then reexamined Kopriva as follows:

"Q. Mr. Kopriva, Mr. Eads has done an excellent job of outlining for you what the law says and what the constitution says.

"A. Yes, sir.

"Q. You are certainly a mature adult, and you certainly have the option at this point of stating to us that you disagree with that law. All right, sir?

"A. (Headnod.)

"Q. So, that's really what I'm asking you. Do you, even though the law may say that the defendant has a right to remain silent, the law may say that the defendant can sit here and not open his mouth, the law may say that the defense counsel can sit here and not open their mouths. Do you yourself still feel that the lawyers should at least put on some evidence or that the defendant should at least take the stand?

"A. No, sir. I understand the question now. If he proves his case beyond a reasonable doubt that the defendant is guilty, well then, I'm sure that y'all are not going to sit there and just let—without saying a word—I mean, that's what the trial is about.

"Q. I'll admit we are kind of stretching it a little bit.

"A. Yes, sir.

"Q. And certainly we will be talking just as we are talking here today.

"A. Yes, sir.

"Q. But let's say we do all of our talking out here at the counsel table and no evidence of any kind is put forth in behalf of the defendant.

"A. Yes, sir.

"Q. Do you feel that a defendant should put on some evidence of some kind in order to refute or to contest his guilt?

"A. No, sir. I leave that up to the defendant."

■ It is obvious that Kopriva was initially confused as to the relationship between appellant's right to remain silent and his right to effective assistance of counsel. Subsequent questioning by both the prosecuting attorney and defense counsel makes it clear that Kopriva did not expect appellant to testify or present other evidence but only that his attorneys would do their best on his behalf. The trial court did not err by overruling the challenge for cause. *Scott v. State*, 490 S.W.2d 578 (Tex.Cr.App.1973).

Appellant contends that his challenge for cause to venire member Robert Latsha should have been granted because he believed that death is the only proper punishment for capital murder. This contention is based on the following exchange with defense counsel:

"Q. Okay, let's assume that the State puts on—here again, a hypothetical case, the State puts on—that you were sitting in a capital murder case and the State proved beyond a reasonable doubt, satisfied you that the individual, that the defendant in that particular case caused the death of a police officer by shooting him with a gun and that the defendant knew he was a police officer and knew he was acting in the lawful discharge of his duties.

"Now, do you have an opinion, having found that man guilty, as to what proper punishment would be in that case?

"A. Do I have an opinion as to what the proper punishment would be?

"Q. Yes, sir.

"A. I thought the way it was stated, there is only one punishment for capital murder.

"Q. All right. What do you believe the one punishment is for capital murder?

"A. The death penalty.

"Q. All right. And do you believe that should be the proper punishment for capital murder?

"A. Yes, sir.

"Q. And that's an affirmative opinion of yours?

"A. Yes, sir.

"Q. And is that an opinion that you have arrived at as a result of your past experience and your upbringing and your thinking that you have indicated that you have made about the death penalty?

"A. Yes, sir.

"Q. And it would be your position that if a capital murder case, involving the shooting of a police officer, that if that—if the individual was proven guilty beyond a reasonable doubt that he shot a police officer who was in the lawful exercise of his duties and knew that man was a police officer when he shot him, that in your mind the only proper punishment that could be given would be the death penalty?

"A. Yes, sir."

■ Prior to this exchange, the prosecutor, during his voir dire, had stated to the venireman that the law provides that the punishment for capital murder "shall be death." That this misled Latsha is indicated by his statement to defense counsel that, "I thought the way it was stated, there is only one punishment for capital murder." After the punishment alternatives and procedure were better explained, Latsha clearly stated that he would affirmatively answer the punishment issues only if the State met its burden of proof and that he believed death to be the proper punishment only if the answers to the issues were yes. No error is shown.

Appellant contends juror James Smith expressed an opinion as to his guilt and a bias against the minimum punishment for murder during his voir dire examination. The first contention is based on the following exchange with defense counsel:

"So since we have publicity in this case I have to ask you, sir, whether

or not, based on what you've read and maybe something you've heard from discussions at Fort Hood with people that you work with, whether you've formed an opinion as to the guilt or the innocence of this man?

"A. An opinion. I don't know whether it would be an opinion—an assumption I would say—assuming—I don't know.

"Q. Well, now, I don't know that it really requires, I think, whether you call it an opinion or assumption. Let me ask you this. Would it require some evidence for you to set aside that assumption or feeling that you have?

"A. I'm not a lawyer but it seems to me like if he was found with a weapon that would be pretty conclusive in my way of thinking. If it was proved to be the weapon that shot the policeman.

"Q. I understand what you're saying.

"A. I don't know.

"Q. And the point I'm trying to make, of course, is the State has gone over when we say the State has the burden of proof, what does that mean to you?

"A. It means they have to prove it beyond a doubt.

"Q. Alright, now, sometimes we have individuals and everyone's opinion, of course, they're entitled to their opinion and sometimes a person's opinion agrees with the law and sometimes it doesn't. Sometimes their feelings agree. We can't help but have feelings established about something and the only thing that I'm trying to get at is because of what you read and because of this feeling that you have, for example about the gun, would you require the defendant to produce evidence of his innocence to you before you could set aside these feelings?

"MR. EADS: I'll object to the question, Your Honor. He's said that he would make the State prove the burden of proof, your Honor.

"THE COURT: Overruled. Answer the question.

"A. I think the State would have to prove it.

"Q. . . .. You still would agree that you have formed some sort of feelings about this case?

"A. As to the guilt or innocence?

"Q. Yes, sir.

"A. An opinion, yes. I have formed an opinion but now whether it's been proven I don't know whether I'm correct or not.

\* \* \* \* \* . \*

"Q. Let me ask you this, sir. If you were serving as a juror on a criminal case, not necessarily this case and at the close of evidence you felt like the defendant was probably guilty but you weren't sure beyond a reasonable doubt, how would you feel compelled to vote in the jury-room?

"A. You would have to prove to me that he was guilty as a juror before I would say guilty."

In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court said:

"The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent" jurors.' *Irvin v. Dowd*, 366 U.S. [717] at 722, 81 S.Ct. [1639] at 1642, 6 L.Ed.2d 751. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

" 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if

the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Id., at 723, 81 S.Ct. [1639] at 1642.

"At the same time, the juror's assurance that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' Ibid."

421 U.S. at 799, 800, 95 S.Ct. at 2036.

■ The voir dire of Smith fails to show that he would be influenced as a juror by any opinion or prejudice or by anything he may have heard or read about the case. The trial court did not err in overruling appellant's challenge for cause based on Smith's alleged opinion as to appellant's guilt. *Freeman v. State*, supra.

Appellant's contention that Smith was biased against the minimum punishment for murder is based on the following voir dire examination by defense counsel:

"Q. And murder being defined the same way, the knowing and intentional killing of another human being. Do you feel like that in a murder case that you could consider as little as five years as a punishment?

"A. I don't think so, sir.

"THE COURT: Counsel, you need to explain to him that you're talking about not this case but a proper case.

"Q. Right. We're not talking about any particular murder case. The definition of murder never changes. Murder is always the intentional and knowing killing of another human being. But the facts change.

"A. Yes, sir.

"Q. And we have different facts and different cases so we have a range of punishment that varies. But even so some people themselves feel that since the definition never changes that they just could not go along with what the law says and give somebody as low as five years for the intentional and knowing killing of another human being.

"A. I think my answer would have to depend on the facts of the case involved, would it not? That's a hard question for me to answer.

"Q. I understand, sir. I'm just—

"A. I'm not trying to hedge, I just don't know the answer.

"Q. I understand what you're saying. And as the judge said we're not talking about a particular case, but we do have the same definition regardless of what the facts are and so I'm just talking about where you have the knowing and intentional killing of another human being.

"A. If it's obvious murder I don't think five years is—I don't see the five years.

"Q. Where do you get this opinion from?

"A. I just don't believe in murder.

"Q. Alright. You understand, of course, that as the judge has said, we don't know what the facts would be and I would submit to you that there are all kinds of facts—

"A. Yes, sir.

"Q. And that some facts there may be some sort of mitigating circumstances and I don't know what those mitigating circumstances would be but still you would think that regardless of what was shown to you that you would still be unable to give five years in a case for the knowing and intentional killing of another human being?

"A. Yes, sir, I don't think I could."

Thereafter, the prosecutor sought to rehabilitate the juror by demonstrating the wide range of fact situations that may fall within the murder statute. The prosecutor then questioned Smith as follows:

"The point I'm trying to make, Mr. Smith, is this. You can see why we have a range of punishment for murder.

"A. Yes, sir, I see.

"Q. And all I'm saying is, do you feel like that as a juror in the State of Texas, that you could sit and listen to the evidence and consider the full range of punishment in a criminal case. If it's a murder case you could consider not less than five years or life in the Texas Department of Corrections in that proper case where the facts justified it. Where the law allowed it and the circumstances warranted that particular punishment? That's the point I'm trying to make."

 Smith stated that he could consider the minimum punishment in a proper case. The record does not support appellant's contention that Smith could not give the minimum punishment of five years and that the juror was subject to challenge for cause pursuant to Art. 35.16(c)(2), V.A.C.C.P. *Von Byrd v. State*, supra.

 Since we have concluded that Kopriva, Latsha, and Smith were not excludable for cause, it follows that appellant was not wrongfully deprived of a peremptory challenge upon a venire member who was subject to challenge for cause or forced to accept such a venire member as a juror. Thus, the trial court did not abuse its discretion in denying appellant's request for three additional peremptory challenges. *Von Byrd v. State*, supra; *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977).

In twelve grounds of error, appellant complains of the admission of evidence offered to show a motive for the commission of the instant offense that also shows he committed extraneous offenses in New Mexico. Michael Roach, a deputy sheriff in Valencia County, New Mexico, testified that he arrested appellant on October 29, 1977, for criminal sexual penetration of a minor and later took him before a magistrate for arraignment. John Horecek, a magistrate in Valencia County, testified that he arraigned appellant on November 1, 1977. At this time, Horecek informed appellant that he was charged with two counts of sexual penetration of a minor carrying a maximum punishment of imprisonment for life and one count of kidnapping carrying a maximum punishment of imprisonment for fifty years, and set bail at $100,000. Ronald Childress, a New Mexico attorney, testified that he represented appellant in regard to these charges and that a trial was set for January 30, 1978. Lawrence Romero, sheriff of Valencia County, Daniel Hawkes, a deputy sheriff, and Velma Hardesty, the jailer, testified that appellant escaped from the Valencia County jail on January 9, 1978. These witnesses identified and the trial court admitted in evidence certified copies of the complaint, indictment, and arraignment in the sexual penetration and kidnapping case, and an indictment and arrest warrant charging appellant with escape.

 In its charge to the jury, the trial court limited the jurors' consideration of these extraneous offenses to the question of appellant's motive for killing the deceased. One of the exceptions to the general rule that an accused is entitled to be tried on the accusation made in the State's pleading and not for some collateral crime or for being a criminal generally is that evidence showing a motive is admissible even though it also shows the commission of an extraneous offense. *Hughes v. State*, 563 S.W.2d 581 (Tex.Cr.App.1978); *Cherry v. State*, 488 S.W.2d 744 (Tex.Cr.App.1972); *Rodriguez v. State*, 486 S.W.2d 355 (Tex.Cr.App.1972); *Stephens v. State*, 147 Tex.Cr.R. 510, 182 S.W.2d 707 (Tex.Cr.App.1944).

Although several cases in which extraneous offenses were held admissible to show motive were prosecutions for escape or for offenses growing out of an escape, appellant is mistaken when he argues that the rule of admissibility is limited to this nar-

row fact situation. In *Hughes v. State*, supra, the ·defendant shot a police officer who had stopped him for investigation of a reported case of credit card abuse. This Court held that the defendant's extortion conviction in an Alabama federal court seven months prior to the shooting, which resulted in a three-year probated sentence, was admissible to show motive. In *Cherry v. State*, supra, the defendant's escape from a Georgia penitentiary, where he was serving a life sentence, was held to be admissible to show his motive for shooting a police officer eight months later. To the same effect are *Washburn v. State*, 167 Tex.Cr.R. 125, 318 S.W.2d 627 (1958) (evidence that the defendant attempted to extort money from his victim four years prior to the murder) and *Ellisor v. State*, 162 Tex.Cr.R. 117, 282 S.W.2d 393 (1955) (evidence that the defendant committed a burglary two days prior to shooting a police officer who stopped him for speeding.)

 Appellant argues that it was unnecessary to admit the New Mexico offenses because there was other evidence of motive, including the apparent arson at the Silver Spur and statements appellant had made to friends threatening to kill a Harker Heights policeman. That appellant may have had other motives for killing Levin, however, does not mean that he was not motivated by a desire to avoid his return to New Mexico. See *Hughes v. State*, supra; *Ellisor v. State*, supra. The trial court did not err in admitting the evidence of extraneous offenses for the limited purpose of showing motive.

 Appellant contends that the trial court erred by refusing to define "probability" in its charge to the jury at the punishment stage of the trial. This Court has previously held that such a definition is not required. *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977). No error is presented.

Two psychiatrists, Drs. John Holbrook and James Grigson, were called by the State to testify at the punishment stage of the trial. Both doctors were given a hypothetical fact situation based on the evidence in this case and asked if the individual described in that question would probably commit future acts of violence that would constitute a continuing threat to society. Both doctors testified that in their opinion he would do so.

Appellant argued at the trial, as he does now on appeal, that Holbrook and Grigson were not qualified to give an opinion as to his future conduct because they had not personally examined him and based their opinions solely on the State's hypothetical question. Appellant also argues that psychiatrists, as a group, are not qualified by education or training to predict future behavior. Appellant does not contest the individual qualifications of either witness.

 This Court is well aware that the ability of psychiatrists to predict future behavior is the subject of widespread debate. However, we are not inclined to alter our previously stated view that a trial court may admit for whatever value it may have to a jury psychiatric testimony concerning the defendant's future behavior at the punishment stage of a capital murder trial. *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr. App.1978); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976).

 The trial court did not err by permitting the doctors to testify on the basis of the hypothetical question. The use of hypothetical questions in the examination of expert witnesses is a well established practice. 2 C. McCormick and R. Ray, Texas Evidence, Sec. 1402 (2d ed. 1956). That the experts had not examined appellant went to the weight of their testimony, not to its admissibility.

 Appellant argues that the hypothetical question was improper because it was not based on all of the evidence in the case. Although a hypothetical question must be based on the facts of the case, counsel may assume the facts in accordance

with his theory of the case. If the opponent desires to secure the expert's opinion upon a different set of facts he may do so on cross-examination. *Atkinson v. State*, 511 S.W.2d 293 (Tex.Cr.App.1974); *Knoeppel v. State*, 382 S.W.2d 493 (Tex.Cr.App. 1964); *McMurrey v. State*, 145 Tex.Cr.R. 439, 168 S.W.2d 858 (Tex.Cr.App.1943); *Davis v. State*, 54 Tex.Cr.R. 236, 114 S.W. 366 (1908). These grounds of error are overruled.

■ Appellant also contends that Holbrook and Grigson should not have been permitted to express an opinion as to the probability of future violent behavior on his part because such testimony constitutes a legal conclusion. Appellant cites the case of *Carr v. Radkey*, 393 S.W.2d 806 (Tex.Sup. 1965). In that case, the Court held that

"a witness may not be asked whether a testator had the mental capacity to make and publish a will because, under *Brown v. Mitchell* [88 Tex. 350, 31 S.W. 621 (1895)] whether a person has mental capacity to execute a will involves a legal definition and a legal test. A witness may be asked, assuming he knows or is a properly qualified expert, whether the testator knew or had the capacity to know the objects of his bounty, the nature of the transaction in which he was engaged, the nature and extent of his estate, and similar questions." 393 S.W.2d at 813.

Appellant argues that a witness should not be permitted to testify that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society because the question involves a legal definition and a legal test.

Appellant's contention is without merit for the simple reason that "probability," "criminal acts of violence," and "continuing threat to society" are not terms defined by statute or case law. On the contrary, they are words of ordinary meaning. *King v. State*, supra. Thus, the testimony in question did not involve the application of a legal definition or test. We also note that if appellant were correct in arguing that a witness may not express an opinion on a matter involving a legal definition or test, this would, among other things, prevent the routine practice of asking a psychiatrist whether, in his opinion, the defendant was legally insane at the time of the offense. V.T.C.A.Penal Code, Sec. 8.01.

■ Finally, appellant contends that Art. 37.071, V.A.C.C.P., is unconstitutional because the term "probability" is so vague that men of common intelligence must guess as to its meaning and application. This contention has been repeatedly overruled by this Court. *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976); *Collins v. State*, 548 S.W.2d 368 (Tex.Cr.App.1976); *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App. 1975), aff'd 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

■ At the punishment stage of the trial, witnesses from various cities in New Mexico, Kansas, Oklahoma, Louisiana, and Texas testified that appellant's reputation in their communities for being a peaceful and law-abiding citizen was bad. Evidence was also admitted of appellant's prior conviction in Louisiana for possession and distribution of marihuana, possession of amphetamine, and carrying a concealed weapon, and in a federal district court in Oklahoma for unlawful possession of a sawed-off shotgun. This evidence, together with the evidence adduced at the guilt-innocence stage of the trial, is more than adequate to support the jury's affirmative answers to the punishment issues.

■ Although appellant's counsel and the State have both filed briefs which are of excellent quality and which greatly aided the Court in its difficult decision, the appellant has filed a pro se brief in which he asserts additional grounds of error. In addition to the grounds of error urged by counsel appellant asserts that the trial court

erred in refusing to grant his motion for an instructed verdict and in refusing to sequester the jury during the trial. The evidence that we have already summarized in this opinion is amply sufficient to support the jury's verdict and the court did not err in overruling appellant's motion for an instructed verdict. The careful trial judge considered the appellant's motion concerning the sequestering of the jury during the trial and overruled that motion. Whether to grant this motion is within the discretion of the trial court, and we find nothing to show an abuse of discretion by the trial judge in overruling that motion. The grounds of error presented by the pro se brief are overruled.

The judgment is affirmed.

ROBERTS, J., concurs in result.

CLINTON, Judge, dissenting in part.

To the overruling of the twelve grounds of error concerning admission of evidence showing commission of extraneous offenses in New Mexico, I respectfully dissent. The Court appears to recognize other proof made by the State and to acknowledge that it showed appellant killed Levin from a more immediate, localized motivation. Given the obvious prejudicial impact of the extraneous New Mexico offenses, I cannot agree that we may tolerate it on the double negative theory that existence of other motives for killing Levin "does not mean that he was not motivated by a desire to avoid his return to New Mexico." It seems clear to me that this is the classic case where slight probative value is far outweighed by heavy prejudice.

PHILLIPS, J., joins.